NICHOLAS B. RIZZO *v.* CLAUDE W. PRICE, JR., ET AL.

HOUSE, C. J., THIM, RYAN, SHAPIRO and LOISELLE, Js.

Argued January 5—decided March 7, 1972

*Thomas F. Parker,* for the appellant (plaintiff).

*Morton C. Hansen, Jr.,* with whom, on the brief, were *Joseph J. Fauliso* and *Morton N. Katz,* for the appellees (defendants).

THIM, J. This action was based on a contract arising out of the dissolution of an insurance agency partnership in which the plaintiff Nicholas B. Rizzo and the named defendant Claude W. Price, Jr., were partners and the defendant Theodore Thompson was an employee. The plaintiff sought to recover damages resulting from an alleged breach of the contract. The defendants admitted the material allegations of the complaint but denied that the agreement was a valid contract. They also interposed four special defenses: (1) lack of consideration, (2) failure of consideration, (3) unjust enrichment and (4) that the contract was illegal. The court found the issues for the defendants and from the judgment rendered the plaintiff appealed to this court. The parties stipulated that the principal amount due the plaintiff if the agreement in suit and the performance thereof is valid should be $2130.78.

The unassailed finding of facts discloses the following: In 1960 or 1961, Rizzo and Price started an insurance agency known as the Copper Hill Agency. During the partnership, the Dalene Hardwood Flooring Company's insurance account was the most valuable, representing more than 50 percent of the value of the agency. The defendant Thompson was the procuring cause of the Dalene account and had been paid 35 percent of the commission earned by the agency from that account. In 1965, the parties decided to dissolve the partnership and commenced to negotiate its dissolution. They agreed on a divi-

sion of the assets and came to an agreement on the disposition of the Dalene account. On September 28, 1965, they executed a written agreement whereby any commission received at any time from the Dalene account by any one of the parties would be divided within five days of receipt as follows: (a) 35 percent to Thompson, (b) $32\frac{1}{2}$ percent to Rizzo and (c) $32\frac{1}{2}$ percent to Price. Pursuant to this agreement, the defendants made payments to the plaintiff for several years but refused to pay any share of the commission generated by the account in 1969. This refusal to make the agreed-on payments was on the advice of counsel that such payments were prohibited by statute.

When the new policies in question were negotiated in 1969, the plaintiff was not a licensed agent under the provisions of § 38-72 of the General Statutes with any of the insurance companies which issued the Dalene policies. Nor was he licensed with any company for which he was then accustomed to transact insurance business of the same character as the insurance sold by the defendants to Dalene. At the time, the plaintiff was licensed by only one company to sell casualty insurance. Other than placing a few orders for surety bond coverage with this company, the plaintiff did not write any casualty insurance. In fact, since the dissolution of the partnership in 1965, the plaintiff has not been actively engaged in the insurance business but, rather, has been operating a retail photography business on a full-time basis. With respect to the policies in question, or any other policies issued to Dalene, the court found that the plaintiff had nothing whatsoever to do with their being negotiated, quoted, written, serviced or issued.

From these facts the court concluded that the con-

tract, which provides for sharing the commissions generated by the Dalene account, is illegal and void and would subject the parties to criminal liability under § 38-2 in that the arrangement conflicts with or is not authorized by the General Statutes.[1] More specifically, the court concluded, inter alia, that the sharing of the commissions with the plaintiff was prohibited by §§ 38-75 and 38-92 of the General Statutes, since the plaintiff was not a licensed agent with any of the insurance companies issuing the policies in question, was not accustomed to transact insurance business of the same character as that involved in the Dalene account for any insurance company for which he was duly licensed to act as an agent, and did not solicit or bring such insurance business to the defendants. In assigning as error the court's conclusions, it is the plaintiff's contention that the performance of the agreement does not violate the applicable provisions of the insurance statutes.

Whether the facts warrant the court's conclusion that sharing the insurance commissions, as provided for in the contract, is prohibited by law depends on the construction given to the statutes within chapter 677, entitled "Agents, Brokers and Adjusters." After a careful analysis of the relevant statutes, we hold that the court erred in concluding that the proscriptions of that chapter are applicable to the case at bar.

In construing statutes to ascertain legislative intent, we must look to "their legislative history, their language, the purpose they are to serve, and the

---

[1] This statute provides that a violation of any section within title 38, entitled "Insurance," is a crime. "Sec. 38-2. GENERAL PENALTY. Any person or corporation violating any provision of this title for the violation of which no other penalty is provided shall be fined not more than five hundred dollars."

circumstances surrounding their enactment. *Connecticut Light & Power Co.* v. *Sullivan,* 150 Conn. 578, 581, 192 A.2d 545; *Mack* v. *Saars,* 150 Conn. 290, 294, 188 A.2d 863." *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 97, 291 A.2d 721. On delving into such considerations we find that chapter 677 is highly regulatory and imposes stringent requirements on those who sell insurance or receive commissions, one requirement being that agents must be licensed. General Statutes § 38-72. Since those purchasing insurance must rely on the advice of the agent and purchase insurance from or through him, the legislature sought to protect the public by a licensing procedure which insures that those engaged in the business are qualified. Statutes requiring a license or certification to act as an agent "are adopted as a matter of public policy to further the public interest." *Dunn* v. *Phoenix Village, Inc.,* 213 F. Sup. 936, 947 (W.D. Ark.). "[T]he primary purpose . . . is to prevent or discourage the unregulated and unlicensed from carrying on . . . [the insurance business], thus protecting the public from surrendering its money in exchange for questionable or worthless pieces of paper denominated insurance policies." *State ex rel. Herbert* v. *Standard Oil Co.,* 138 Ohio St. 376, 381, 35 N.E.2d 437; see 16 Appleman, Insurance Law and Practice § 8632, and cases cited. To promote such a protective policy, the legislature also enacted § 38-71, entitled "Penalty for acting as agent . . . without license," wherein acting as an insurance agent without a license is prohibited and subjects such violators to criminal prosecution. "Any person who acts . . . as an insurance agent . . . unless such person holds a license . . . authorizing him so to act . . . shall be fined . . . or imprisoned." § 38-71.

Both §§ 38-71 and 38-72 seek to protect the public from those who would "act" as an insurance agent without a license. The words and phrases used in a statute "shall be construed according to the commonly approved usage of the language." General Statutes § 1-1; *Hartford Electric Light Co.* v. *Water Resources Commission,* supra; *State* v. *Benson,* 153 Conn. 209, 214, 214 A.2d 903. "Or, stated another way, statutory language is to be given its plain and ordinary meaning." *Klapproth* v. *Turner,* 156 Conn. 276, 280, 240 A.2d 886; *State* v. *Taylor,* 153 Conn. 72, 82, 214 A.2d 362. Webster's Third New International Dictionary defines "act" as, inter alia, "a thing done or being done . . . something done by a person pursuant to his volition." To "act" as an agent within the meaning of chapter 677 is "to solicit, negotiate or effect contracts of insurance or surety." § 38-69.

In keeping with the legislative policy of preventing unlicensed persons from soliciting, negotiating or effecting insurance policies from a vulnerable public, § 38-92, entitled "Payment of commissions to unlicensed persons," was enacted. Under this statute it became a criminal offense for an insurance company, agent or broker to "pay, directly or indirectly, any commission or other valuable consideration to any person . . . for services performed . . . as an insurance agent or broker unless such person . . . holds a license." By prohibiting the payment of commissions, the legislature obviously hoped to dissuade unlicensed persons from circumventing the law by soliciting, negotiating and effecting insurance policies and then placing them through licensed agents in return for a commission. As with §§ 38-71 and 38-72, this statute prohibits an unlicensed person from seeking commissions for serv-

ices rendered. In gleaning such an intent we have considered the practical interpretation placed on the statute by the insurance commissioner. See *Cedar Island Improvement Assn.* v. *Clinton Electric Light & Power Co.*, 142 Conn. 359, 369, 114 A.2d 535. While not conclusive, it is relevant to our inquiry. It states: "Its [General Statutes § 38-92] primary purpose is to strengthen the law which prohibits unlicensed persons from *acting* in any capacity as an agent or a broker." (Emphasis supplied.) See Digest, Administrative Reports to the Governor, 1948–1949.

In analyzing the previously cited statutes a clear legislative intent emerges. The legislature intended to protect the public from those unlicensed persons who actively engage in servicing, soliciting, negotiating or effecting insurance contracts. In the case at bar, if the plaintiff, the unlicensed party, had actually "acted" in the capacity prohibited, the defendants would prevail. Since, however, the payments of the insurance commissions to the plaintiff were not for services as an agent or a broker, they are not prohibited under chapter 677. The plaintiff never acted as an agent nor held himself out to the public as an agent. In fact, the court recited in approximately twelve findings that the plaintiff had nothing whatsoever to do with servicing, soliciting, negotiating or effecting the policies in question or any other policies for the Dalene account.

Nor does § 38-75, as relied on by the court and the defendant, prohibit the payments under the contract. This section, entitled "Sharing commission," reads: "Any licensed agent may share with any other licensed agent his commission on insurance business brought to him by such other licensed agent, provided such insurance business shall be of such

character as such other licensed agent is accustomed to transact for an insurance company for which he is licensed to act as agent." As the defendants correctly note, § 38-75 "creates an exception to the usual rule that the agent must be licensed with the particular company writing the insurance in order to be entitled to a commission, i.e., Section 38-75 creates an exception to the rule laid down by Section 38-92. It permits an insurance agent to share his commission with another agent who has been instrumental in bringing an insurance customer to him, regardless of the fact that the other agent is not licensed with the insurance company writing the insurance, but instead is licensed with some other company." This statute is, by its very terms, permissive and merely allows a licensed agent for one company to share a commission with an agent for another company.[2] It necessarily implies that both agents involved have rendered services or acted in some manner toward the account. Since we have held that in the present case no services were rendered by the plaintiff we fail to see how this statute has been transgressed by the contract of September, 1965. We, therefore, conclude that the performance of the agreement entered into by these parties is not prohibited by any of the statutes within chapter 677.

---

[2] Section 38-75 encompasses the following situation: The A company refuses to underwrite an automobile policy for a client of a licensed agent of the A company. Knowing that T company would underwrite such a risk, the agent of the A company contacts an agent of T company, who writes the policy through T company. The agent of the A company is accustomed to writing automobile insurance, but because of the A company's underwriting requirement, he is unable to negotiate this particular type of insurance with the A company. Under § 38-75, T company may share part of the commission generated by this policy with the agent of the A company for his services rendered.

One final point warrants discussion. The defendants contend that the court erred in failing to conclude that the contract was void due to a lack or failure of consideration. While the defendants made these contentions in a properly filed assignment of errors, they failed to file a cross appeal. This procedure is without sanction in the Practice Book. For an appellee to make such claims of error, a cross appeal is necessary. *Peterson* v. *Norwalk*, 150 Conn. 366, 382, 190 A.2d 33; see Practice Book § 607. "Practice Book § 619 requires the trial court to set forth in its finding such facts as may be 'necessary to present the questions which the appellant desires reviewed.' The court is not expected, much less required, to speculate as to what issues the appellees might also wish to have reviewed incident to the appellant's appeal. Practice Book § 623 permitting the assignment of errors by an appellee is limited to assignments 'directed to the finding of any fact or refusal to find any fact.' The assignment of error by the appellees here is directed not to a finding of fact but to a conclusion of law. . . . [A]n appellant in such circumstances is not adequately protected by the right to file a reply brief since the finding is designed to present to this court the facts necessary to test the issues raised by the appeal as taken and an appellant in submitting his draft finding cannot be expected to incorporate in that draft finding facts adequate to test the unknown claims of an appellee. Nor would the appellant in preparing his assignment of errors have the opportunity to contest any improper findings relating to the appellee's then undisclosed claims of error." *DiSesa* v. *Hickey*, 160 Conn. 250, 263, 278 A.2d 785. Despite the procedural defect in the *DiSesa* case, the court went on to the merits on the theory that the

appellant had in no wise been prejudiced. There, the assignment of error was to the effect that the court had made an erroneous conclusion of law. Since the subordinate facts on which such a conclusion would be made were in the finding, it is easy to perceive how the appellant would not necessarily be prejudiced.

In the present case, however, the appellee did not assign as error the court's erroneous conclusion of law, but rather, the court's failure to make certain conclusions. This situation is clearly prejudicial to the appellant. As the plaintiff properly asserts, under Connecticut procedure if the appellee's counter finding carries indications that he is trying to insert extraneous issues in the appeal, the appellant is given no opportunity to file a "counter counter finding." The appellant is prevented from presenting facts bearing on the court's failure to arrive at particular conclusions. The appellant, having had no opportunity to introduce facts into the finding which would support the court's action, the failure to file a cross appeal is prejudicial and fatal. Nor is this a case of such public interest and concern that we will overlook the procedural errors as we did in *Peterson* v. *Norwalk,* supra.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the plaintiff to recover of the defendants the sum of $2130.78 plus interest on this sum from January 1, 1969.

In this opinion the other judges concurred.