## FARMERS AND MECHANICS SAVINGS BANK *v.* FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF MERIDEN ET AL.

House, C. J., Shapiro, Loiselle, MacDonald and Bogdanski, Js.

Argued October 1—decision released November 19, 1974

*Samuel N. Allen,* for the appellant (plaintiff).

*Frank W. St. John,* with whom was *Kenneth R. Larsen,* and with whom, on the brief, were *William M. Stremlau* and *Roger F. Gleason,* for the appellees (defendants).

MacDonald, J.  The plaintiff, Farmers and Mechanics Savings Bank, has appealed from a judgment of the Superior Court denying its request for injunctive relief against the defendants, First Federal Savings and Loan Association of Meriden and King's Department Stores, Inc., in an action involving the plaintiff's attempted enforcement of a restrictive covenant contained in its lease of space in a shopping center purporting to grant to the plaintiff the exclusive right to conduct within the shopping center a "financial or lending business" during the term of the lease.

The plaintiff, hereinafter referred to as Farmers, is a savings bank having its principal office at Middletown, Connecticut. The defendant First Federal Savings and Loan Association of Meriden, hereinafter referred to as First Federal, also is a savings institution having its principal office at Meriden, Connecticut, and the defendant King's Department Stores, Inc., hereinafter referred to as King's, is a Delaware corporation operating a chain of retail department stores in several states, including a store located in the shopping center in question.

The finding, which requires no material correction, sets forth the following facts: On or about February 1, 1973, Farmers entered into a written lease with the Meed Company, hereinafter referred to as Meed, a New York partnership which owned the

Middletown Shopping Plaza, hereinafter referred to as Plaza or Shopping Center, located in Middletown, Connecticut, whereby Farmers leased from Meed for an original term of fifteen years a portion of a building in the Plaza in which Farmers planned to open a branch savings bank facility. On April 25, 1973, Farmers recorded in the Middletown land records a notice of the lease which met the requirements of § 47-19 of the General Statutes.[1] Both the lease and the recorded notice of lease contained the following restrictive covenant: "No bank, savings and loan association, finance company, loan company or other financial or lending business (other than the lessor) shall be conducted within the Shopping Center during the term of this Lease or any extension or renewal hereof."

More than a year prior to the recording of Farmers' notice, on March 3, 1972, King's had leased from Meed space in the Plaza by a written lease of that date which conferred upon King's subleasing rights sufficiently broad to permit King's to sublease a por-

---

[1] "[General Statutes] Sec. 47-19. LEASES FOR MORE THAN ONE YEAR. No lease of any building, land or tenement, for life or for any term exceeding one year or which provides for the renewal thereof or an option to purchase such building, land or tenement, shall be effectual against any persons other than the lessor and lessee and their respective heirs, successors, administrators and executors, unless it is in writing, executed, attested, acknowledged and recorded in the same manner as a deed of land, provided a notice of lease in writing, executed, attested, acknowledged and recorded in the same manner as a deed of land and containing (1) the names and addresses, if any are set forth in the lease, of the parties to the lease, (2) a reference to the lease, with its date of execution, (3) the term of the lease with the date of commencement and the date of termination of such term, (4) a description of the property contained in the lease, (5) a notation if a right of extension or renewal is exercisable, (6) if there is an option to purchase, a notation of the date by which such option must be exercised and (7) a reference to a place where the lease is to be on file shall be sufficient."

tion of the premises described therein to a savings and loan association. Neither the lease between King's and Meed, nor any notice thereof, was recorded in the Middletown land records until May, 1973, after the recording of Farmers' notice of lease. King's commenced operation of a department store in the Plaza on November 6, 1972, in a building contiguous to the one leased to Farmers.

Prior to the execution of its lease with Meed, attorneys for Farmers had searched the title to the premises upon which the Plaza was located, but at the time of the execution of its lease Farmers had no actual knowledge of the provisions of the lease between Meed and King's. Farmers, however, was aware during its negotiations with Meed that King's was in possession of and actively occupying a portion of the Plaza, and made no inquiry as to the specific provisions of King's lease. King's, during negotiations with Meed for its lease, had caused the land records to be searched and had asked for and received copies of previous leases.

Farmers, prior to the execution of its lease, inquired of Meed whether Meed was in a position to grant to it the restrictive covenant in question and was assured by Meed that it was in a position to do so. Farmers assumed that Meed was in a position to lease with restrictive covenants, made no inquiry as to existing leases other than to question Meed, and relied exclusively on Meed's representation as to the validity of the restrictive covenant. Apparently solely on the strength of such reliance, Farmers expended approximately $70,000 to prepare its leased premises for use as a savings bank.

Late in 1972 First Federal was negotiating with King's for the sublease of premises in King's Plaza

store, and these negotiations resulted in a meeting of the minds as to the terms of such lease, as evidenced by a letter dated January 24, 1973, from First Federal to King's. On or about March 23, 1973, First Federal applied to the federal regulatory agency, the Home Loan Bank Board, located in Boston, Massachusetts, for permission to establish a satellite branch office in King's. This application was approved and notice thereof appeared in the Connecticut Banking Department Bulletin No. 503 on April 13, 1973. In the meantime, First Federal had invested more than $25,000 for equipment for its leased premises.

Farmers was aware of "satellite banking," and notified the Home Loan Bank Board, on April 4, 1973, of its displeasure that this site had been approved for First Federal. It was claimed by Farmers that unless enjoined, King's would sublease to First Federal a portion of its premises for use as a satellite branch, but at the time of trial King's had not yet completed the formalities of its sublease of space to First Federal.

The Connecticut Bank and Trust Company operates a branch bank across the street from the Shopping Center and, at the time of the trial, Farmers was operating its branch banking facility at the space in the Shopping Center leased by it from Meed. The location by First Federal of a satellite office at the Shopping Center would cause competition to Farmers at its branch office in the Shopping Center.

From the foregoing facts, the court concluded that Farmers, when it entered into its lease with Meed on February 1, 1973, had constructive and

actual notice of the lease of March 3, 1972, between Meed and King's by virtue of language contained in Farmers' own lease with Meed as well as by virtue of a deed, recorded in the Middletown land records, from Meed to the Washington Holding Company in which reference is made to King's lease. The court further concluded that neither Farmers nor First Federal had actual or record notice of each other's plans for a branch bank in the Plaza until the receipt by Farmers on March 21, 1973, of First Federal's site approval from the Home Loan Bank Board and that neither Farmers nor First Federal was guilty of any wrongdoing, despite the fact that the location of First Federal's branch in the Plaza would be contrary to the covenant between Meed and Farmers. Finally, the court concluded that although the location of either branch office in the Plaza would result in a loss of business to the other, the prior lease to King's is in no way affected by Farmers' subsequent lease containing the covenant restricting the use of King's leasehold interest, and that equity should not act by way of injunctive relief where all parties are equally innocent. In reaching the foregoing conclusions, the court, in effect, overruled Farmers' basic claim of law that it did not have constructive notice of the provision of the lease of March 3, 1972, between King's and Meed. We find that the court correctly overruled this claim of law as well as Farmers' additional claim that Farmers had made reasonable inquiry as to whether Meed was in a position to make the restrictive covenant.

Essentially, Farmers' claim is that the court erred in concluding that the covenant did not bind King's and First Federal since it was subsequent to King's lease. With this contention we cannot agree.

Independent of any rights which might be conferred by statute, it appears to be the majority view that a prior lessee, acting in conformity with the terms of its lease, is not bound by a restrictive covenant subsequently enacted between the lessor and another lessee, and, under such circumstances, injunctive relief to enforce such a covenant against the prior lessee is properly denied.  See, for example, a line of New York decisions, including *Hill Top Toys, Inc.* v. *Great Atlantic & Pacific Tea Co.,* 4 App. Div. 2d 691, 692, 164 N.Y.S.2d 269; *Topol* v. *Smoleroff Development Corporation,* 264 App. Div. 164, 166, 34 N.Y.S.2d 653; *Waldorf-Astoria Segar Co.* v. *Salomon,* 109 App. Div. 65, 95 N.Y.S. 1053, aff'd, 184 N.Y. 584, 77 N.E. 1197. As stated by the court in *Mam Restaurant, Inc.* v. *Rector Street Properties Associates,* 41 Misc. 2d 487, 489, 245 N.Y.S.2d 653, aff'd, 21 App. Div. 2d 751, 251 N.Y.S.2d 909: "Where premises have been conveyed or leased to one tenant, the rights under that lease or conveyance cannot be limited or restricted by a subsequent conveyance or lease by the landlord to a later tenant of different premises . . . . The entire concept of restrictive covenants applies to the use of premises retained by the landlord." See also *Norwood Shopping Center, Inc.* v. *MKR Corporation,* 135 So. 2d 448 (Fla. App.); *Rosen* v. *Wolff,* 152 Ga. 578, 110 S.E. 877; *Baron* v. *Crossroads Center of Iowa, Inc.,* 165 N.W.2d 745 (Iowa); *Slice* v. *Carozza Properties, Inc.,* 215 Md. 357, 137 A.2d 687; note, 97 A.L.R.2d 4, 86–87, and cases cited therein. The fact that Meed represented to Farmers that it was able to give such a covenant and that Farmers relied solely upon that representation and did not seek to investigate whether prior lessees would be bound, particularly where Farmers was

put on inquiry notice of the existence of a written lease between Meed and King's certainly tends to give rise to no equitable right in Farmers that would mandate the enforcement of its covenant against King's.

Farmers argues that the Meed-King's lease is void as to it because no notice thereof was recorded, as required by General Statutes § 47-19.[2] Central to construing the effect of such a recording act is the determination of those persons whom the act is intended to protect. In *Andretta* v. *Fox New England Theatres, Inc.,* 113 Conn. 476, 482, 155 A. 848, a case heavily relied upon by Farmers, this court said: "The effect of the statute requiring leases for more than one year to be recorded is to render them ineffectual as to creditors and bona fide purchasers unless they are so recorded." The effect of the statute is not to render an unrecorded lease void but merely voidable by such persons as are protected under the statute. *Baldwin* v. *Walker,* 21 Conn. 168, 182.

In another early case this court had occasion to consider the effect of a statutory predecessor of § 47-19 and stated: "The lease was in due form of law, and in all respects complete and perfect, except only that it had not been recorded in the town records of Salisbury, the town in which the ore bed lay. This was the only objection to the lease. The defendants insisted that it was by the statute declared to be absolutely void, except as to the lessors; not that they claimed anything themselves under the plaintiffs' lessors, or were deceived or in

---

[2] See footnote 1, supra.

any way injured, by reason of the lease, but it was not recorded and therefore an imperfect and void instrument. Our answer to this is, the instrument was not imperfect and void. It had every legal requisite of a conveyance, and if a legal and perfect instrument between the parties, what have the defendants to . . . [say] against it when the plaintiffs come forward to assert their rights under it, rights which none but creditors and purchasers can properly deny or resist? Recording is no part of the conveyance itself, and to allow a stranger who has no manner of interest in the question, to set up a statute, which requires deeds and leases to be recorded, merely to give public notice, that creditors and bona fide purchasers may not be deceived and cheated, is unreasonable and preposterous." *Barnum* v. *Landon,* 25 Conn. 137, 149, 150.

Farmers here is neither a bona fide purchaser of the property without actual notice nor a creditor of either party to the Meed-King's lease, and, accordingly, the statute offers it no protection. The Meed-King's lease was perfected as to the parties thereto and firmly established the contractual rights and obligations of both parties. To allow a subsequent covenant given by Meed to a third party with actual notice and not privy to the original lease to vary such rights or obligations without the necessity of seeking the assent of the prior lessee, King's, would emasculate one of the basic tenets of contract law, namely, that a party is entitled to rely upon its written contract as the final integration of its rights and duties. It is not within the power of the court to make a new or different contract. *Osborne* v. *Locke Steel Chain Co.,* 153 Conn. 527, 531–32, 218 A.2d 526.

That Farmers has suffered harm as a result of King's sublease to Federal cannot be denied, but such harm was foreseeable and could have been avoided by more diligent investigation by Farmers of Meed's ability to make such a covenant. Farmers, instead, chose to rely upon Meed's representation and must bear the burden of that reliance. King's and First Federal were innocent of any wrongdoing and the trial court did not abuse its equity powers in refusing to enjoin them. Where one of two innocent parties must suffer, the loss should fall upon the party who caused it rather than upon the other who had no agency in producing it and could not by any means have avoided it. *Grissell* v. *Housatonic R. Co.*, 54 Conn. 447, 461, 9 A. 137.

We are not called upon to decide the validity of restrictive covenants of the type involved here[3] and for the purpose of this appeal such a decision is not necessary.[4]

There is no error.

In this opinion the other judges concurred.

---

[3] An exhaustive annotation covering the validity, construction and effect of such covenants may be found at 97 A.L.R.2d 4.

[4] Although both defendants raised this issue at the trial level, the trial court did not find it necessary to rule thereon. Both defendants raised the point as a special defense to the injunction action and by way of counterclaim, alleging an antitrust infraction. No decision was rendered upon the counterclaim nor did either defendant file a cross appeal assigning error in the court's failure to treat this issue. "In general, this court will not entertain issues raised by an appellee unless the appellee has filed an assignment of errors and a cross appeal. Practice Book § 607; *Rizzo* v. *Price,* 162 Conn. 504, 512, 294 A.2d 541 . . . ." *Akin* v. *Norwalk,* 163 Conn. 68, 70, 301 A.2d 258.