ON SITE ENERGY CORPORATION *v.*
SPERRY RAND CORPORATION
(2520)
(2597)

DUPONT, C. J., HULL and SPALLONE, Js.

Argued May 8—decision released September 24, 1985

*Francis J. McNamara, Jr.,* with whom were *Eric W. Wiechmann* and, on the brief, *John F. Spindler,* for the appellant (defendant).

*Richard L. Albrecht,* with whom, on the brief, was *Jorem Hirsch,* for the appellee (plaintiff).

SPALLONE, J. The defendant is appealing from a judgment rendered for the plaintiff after a trial to the court.

The facts as found by the trial court are essentially as follows: The plaintiff, On Site Energy Corporation (On Site) is a Connecticut corporation which was formed in 1967 by Arthur Pivirotto. The purpose of the corporation was to design and lease on site electric generating stations. An on site generating plant consists of gas or diesel engines and the electric generators required to provide all the necessary electric, heating and cooling energy systems for a factory location.

On November 29, 1966, the defendant Sperry Rand Corporation (Sperry), through its then Remington Electric Shaver Division, entered into an agreement with the A. G. & T. Realty & Construction Company (A. G. & T.) to lease a plant owned by A. G. & T. located in Milford.

On August 18, 1967, On Site and Sperry entered into an equipment lease agreement. This equipment lease agreement was extended on December 30, 1971, to May 31, 1975. The equipment lease ran concurrently with the term of the A. G. & T. and Sperry property lease. Under separate operating agreements, also dated August 18, 1967, On Site undertook to operate and maintain the leased equipment for Sperry.

The equipment lease, in paragraph ten, provides: "10. Upon the termination of this lease, Lessor, at its expense, shall remove the equipment from Lessee's premises and Lessor agrees to reimburse Lessee for the actual cost of repairing any damage to said premises caused by such removal and restoring said premises to a condition reasonably satisfactory to Lessee. Such reimbursement shall be made by Lessor promptly upon Lessee's demand therefor."

The operating agreement essentially provided that On Site was to provide the labor and expertise to operate, maintain and repair and make necessary replacements to the equipment installed so as to keep the equipment running at a certain level of efficiency.

The equipment was installed and was operated by On Site without incident until 1975. Shortly after March 6, 1975, On Site received a letter from Sperry. The letter informed On Site that Sperry did not intend to renew the lease, and that it would not require On Site's services after May 31, 1975. In early May, Sperry informed On Site that it would not require service from the leased equipment during the month of May, 1975, and that On Site could adjust the scope of operations, maintenance, repair and replacements of the leased equipment.

On or about April, 1975, Pivirotto learned that A. G. & T. had placed the building on the market for sale. He saw a flier that was distributed by DeScala Associates, a real estate brokerage firm. This flier included a photograph of the energy plant.

During the period from June to July and possibly as late as August, negotiations were taking place between On Site (represented by Pivirotto) and A. G. & T. (represented by Thomas Minogue, Sr.) whereby Pivirotto endeavored either to sell his equipment as a package

deal along with the Milford plant or, alternatively, to purchase the Milford plant himself. Both deals fell through.

By the fall of 1975, Pivirotto's relationship with Minogue deteriorated and Minogue instructed Pivirotto to remove his equipment from the building. Minogue insisted that Pivirotto post a $50,000 bond or a personal guaranty prior to the removal of On Site's equipment from the building. Pivirotto testified that he could not get the required bond after consulting one agency about the bond.

The building in Milford was padlocked, sometime between June and late August, and representatives of On Site lost access to their equipment. The building was apparently padlocked by the owner of the building. Pivirotto then contacted Walter DeGiovanni, who was the superintendent in charge of the operation of the Milford plant for Sperry. He explained to DeGiovanni that he was locked out of the building by the owner of the building; and that the owner required that he post a $50,000 bond for repair to the building, if he was to be permitted to remove the equipment; and that he was unable to get the bond. He asked DeGiovanni what Sperry could do to remove the equipment. DeGiovanni replied that Sperry could not do anything because the contracts had expired.

As to the time required for the removal of the equipment, there was conflicting testimony ranging from three to four days with two months advance planning and coordination, to sixty to ninety days, including planning time.

On January 7, 1976, On Site instituted an action in replevin against A. G. & T. On Site also sought a prejudgment remedy to attach the Milford plant for the sum of $200,000. The prejudgment remedy was denied

and summary judgment was granted in favor of A. G. & T. On Site did not appeal from that judgment and never regained possession of the equipment.

In September, 1976, On Site brought the present action seeking damages for breach of contract and for negligence. After a full trial, the court rendered judgment for the plaintiff in the amount of $287,100, plus costs.

The defendant has appealed claiming, essentially, that the court erred in applying the general principles of law regarding bailments instead of basing its conclusions on the express contract between the parties. We agree.

Both parties agree that their contract relationship was a bailment. They disagree, however, as to whether general principles of bailment or the contract should govern. Where rights, duties and obligations are fully stated in a written contract between the parties, the court is obligated to determine the intention of the parties " 'from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used.' " (Citations omitted.) *Leonard Concrete Pipe Co.* v. *C. W. Blakeslee & Sons, Inc.,* 178 Conn. 594, 598, 424 A.2d 277 (1979). It is not within the power of the court to make a new and different agreement. *Jay Realty, Inc.* v. *Ahearn Development Corporation,* 189 Conn. 52, 55, 453 A.2d 771 (1983). Contracts voluntarily and fairly made should be held valid and enforced by the courts. *Collins* v. *Sears, Roebuck & Co.,* 164 Conn. 369, 377, 321 A.2d 444 (1973). "It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties. *Farmers & Mechanics Savings Bank* v. *First Federal Savings &*

*Loan Assn.,* 167 Conn. 294, 302, 355 A.2d 260 [1974]." *Zullo* v. *Smith,* 179 Conn. 596, 601, 427 A.2d 409 (1980).

Here, the contract between the parties expressed the agreement between them, and in clear, unequivocal and unambiguous language detailed their obligations to each other. The defendant fully performed its contractual obligations to the plaintiff. The court found no breach of contract, and then found the defendant liable in tort based on negligence.

The central and dispositive issue is whether the trial court erred in ignoring the contract between the parties and basing its conclusions on the general principles of bailment law. The essence of bailment is the transfer of possession by one person to another in trust for a specific purpose, "under a contract to return it to the owner according to the terms of the agreement." *Murray* v. *Paramount Petroleum & Products Co.,* 101 Conn. 238, 242, 125 A. 617 (1924). The trial court's lengthy analysis of bailment law is not relevant to the circumstance in this case because it ignores the contractual relationship between the parties. In doing so, the court erred.

A bailment for hire arises out of the contract. The parties are free to regulate the terms and conditions of the relationship in their agreement. While the law of bailment attaches certain implied obligations, these are only implied "in the absence of express provision in the contract to the contrary . . . ." *Douglass* v. *Hart,* 103 Conn. 685, 688, 131 A. 401 (1925).

" 'The rights, duties, and liabilities of the bailor and the bailee must be determined from the terms of the contract between the parties, whether express or implied. Where there is an express contract, the terms thereof control, since both the bailor and the bailee are entitled to impose on each other any terms they respectively may choose, increasing or diminishing their

rights, and *their express agreement will prevail against general principles of law applicable in the absence of such an agreement.'*" (Emphasis added.) 9 Williston, Contracts, (3d Ed. 1967) § 1030, pp. 879–80.

Accordingly, while the law of bailments implies a general obligation to redeliver or account for the property, the parties are free to stipulate the time, place and manner in which redelivery is to be made. "The general principle that the manner of a bailee's redelivery should be in accordance with the contract stipulations is too well settled to belabor." *In re International Marine Development Corporation,* 451 F.2d 763, 766 (5th Cir. 1971); 8 C.J.S., Bailments § 37 (b).

The contract between the parties clearly indicated the time, place and manner that redelivery would be effected and when the obligations between the parties would cease. The time was obviously May 31, 1975; the place was the site of the equipment on that date; and the manner was clearly spelled out in paragraph 10 of the lease between the parties. On Site had the obligation to remove the equipment. Sperry fulfilled its obligations under the contract when it vacated the premises and left the equipment in place and in good condition, because that was what it was authorized and required to do under its agreement with On Site.

Whatever mischief may have flowed from the events subsequent to May 31, 1975, were of On Site's own doing. It chose to allow the equipment to remain in place while it negotiated various alternatives with A. G. & T. Whatever demands A. G. & T. made of On Site were between them and had nothing to do with Sperry. On Site's loss of the equipment by the failure of its replevin suit against A. G. & T. was outside the duty, control or interest of Sperry.

We conclude that the relationship between On Site and Sperry ended on May 31, 1975, and that the trial

court's conclusion that Sperry owed a duty to On Site enforceable in an action sounding in negligence was clearly erroneous, as was the court's application of the general principles of bailment in disregard of the express terms of the contract between the parties.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.