[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Hoyts Cinemas Corporation and Interstate Connecticut Corp. appeal from the decision of the Stonington Board of Assessment Appeals denying Hoyts' request for a reduction in the assessment of its real estate in Stonington on the grand lists of October 1, 1994 through October 1, 1997.
The plaintiffs operate a small, three screen cinema located in a 10,340 square foot freestanding building in a retail complex in the town of Stonington known as Olde Mistick Village (Village). The cinema was constructed in 1973 as a two-screen cinema and enlarged in 1983 to accommodate a third screen. The plaintiffs do not own the land, but lease the building. The free standing building, which is the subject of this appeal, is known as Building 18 in the Village. The Village consists of approximately 22 acres of land on which 28 free standing commercial buildings are situated. Patrons of the cinema have use of parking spaces on the whole 22 acres of the Village by virtue of the terms of the lease on the subject property. Parking is not limited to the 2.5-acre site upon which the cinema is located. This appeal contests only the valuation of Building 18, not the land underneath it.
The Village is located in the southeastern part of the state near two top tourist attractions, Mystic Seaport and Mystic Aquarium. Eight hotels and motels and an assortment of restaurants surround the Village. The Village itself resembles an 18th century colonial village.
On October 1, 1994, the Village was owned by Mall, Inc., which is not a party to this action. Mall Inc. leased Building 18 to the plaintiffs pursuant to a lease dated January 19, 1973, as amended, which makes payments of excess real estate taxes on the subject property the obligation of the plaintiffs.
The defendant town claims at trial that the plaintiffs are not aggrieved since they have not complied with General Statutes § 12-117a,[1] which requires a recording of a notice of a lease with an obligation on the part of the lessee to pay the CT Page 11627 real property taxes. A notice of the lease executed on January 14, 1973, was recorded on the Stonington land records on June 5, 1973. The notice recited that the lease was for a term of ten years from May 1, 1973, with two five year options to renew the lease. In 1977 an addendum to the lease was subsequently executed granting to the lessee two additional options to renew the lease through the year 2003. No notice was filed on the Stonington land records for the 1977 addendum. The defendant town has admitted that the plaintiffs are lessees pursuant to the lease dated January 19, 1973, and that they are obligated to pay real estate taxes. The defendant argues that since no additional notice of the lease was recorded on the Stonington land records showing the amendments to the original 1973 lease, the plaintiffs have not complied with § 12-117a dealing with the right to appeal a tax assessment by any person, including a lessee whose notice of lease has been recorded pursuant to General Statutes § 47-19.[2]
Specifically, the defendant claims that the notice of lease is defective for the following reasons:
 1. There is no assignment of the lease to the plaintiffs.
 2. There is no notice of the amendment extending the term of the lease to 2003.
 3. The demised premises is not adequately described in the notice.
 4. The addresses of the parties are not included in the notice.
The plaintiffs contend that either the present notice recorded on the land records is sufficient, or that the plaintiffs need not meet the requirements of § 47-19 because the defendant admits that the plaintiffs are lessees and bound to pay the property taxes and, in addition, the plaintiffs meet the classical test of aggrievement.
The purpose of § 47-19 is to give public notice of deeds and leases so that creditors and bona fide purchasers may not be deceived and cheated. Farmers Mechanics Savinqs Bank v. FirstFederal Savings Loan Assn., 167 Conn. 294, 302, 355 A.2d 260
(1974), citing Barnum v. Landon, 25 Conn. 137, 149, 150. The obvious purpose of § 12-117a, in citing § 47-19, is to CT Page 11628 allow a lessee, who is obligated under the lease to pay the property taxes in lieu of the owner, to provide notice to the municipality of this agreement. The effect of § 47-19 is not to render leases void but rather voidable as to persons whom the recording act is designed to protect. Farmers Mechanics SavingsBank v. First Federal Savings Loan Assn., supra, 167 Conn. 301. The town cannot claim protection under § 47-19 because it admits that the plaintiffs are the lessees of the subject property, and that they are obligated to pay the taxes, the very information which the notice statute was designed to provide to the town.
Turning to the issue of value, the assessor placed a fair market value on the subject property of $767,686, as of October 1, 1994, the revaluation date. Both the plaintiffs' appraiser, William E. Kane, and the town's appraiser, Robert J. Flanagan, are of the opinion that the highest and best use of the subject property is for its continued use as a three screen theater. We agree.
Both Kane and Flanagan used the cost approach and the income approach to value the property as of October 1, 1994. Kane arrived at a value of $400,000. Flanagan arrived at a value of $770,000.
Although Kane and Flanagan used both the cost approach and income approach, both acknowledged that a willing buyer would consider the income approach to value in offering to purchase the subject property, not the cost approach. "The cost approach is generally most applicable in valuing new or relatively new construction when improvements represent the highest and best use of the site, site value is well supported, and no functional or external obsolescence is evident." The Appraisal Institute, TheAppraisal of Real Estate (10th Ed. 1992) p. 321. The subject property does not fit into this category.
Turning to the income approach, both appraisers conceded that the actual rent of the subject is well below market rent. Kane computes the actual rent on October 1, 1994, to be $3.85 per square foot of space. Flanagan, on the other hand, computed the actual rent on October 1, 1994, to be $4.01 per square foot of space. The parties disagree on the square footage of the subject building. Flanagan used the assessor's records showing 10,222 square feet, whereas Kane measured the building and concluded that the subject building contained 10,340 square feet. We find CT Page 11629 that the actual measurement controls and conclude that 10,340 square feet is the total square footage of the subject building.
In determining the value of the subject building, both appraisers looked to other cinema operations and their profitability. The profitability of the cinema operation determines what percentage of the business may economically be apportioned to rent of a non-owned facility. Typically, cinema rentals are structured on a fully net basis, that is with the tenant responsible for all expenses, including structural repairs. In the subject lease, the landlord pays the basic real estate taxes, insurance and maintenance. With actual rent of $39,889 paid by the tenant in 1994, less landlord's contribution of base taxes of $5,094, insurance of $3,105, and maintenance of $3,508, a comparable triple net rent for the subject would be $28,182 or $2.72 per square foot of building area.
From an economic standpoint, the owner of the subject property is locked into a lease extending to the year 2003. In 1994, a prospective purchaser must realistically look at the subject building as encumbered by a lease that produces a net income of $2.72 per square foot through the next nine years. Although the present lease contains a provision for the payment of additional rent based upon a percentage of box office sales above a breakpoint, that breakpoint has not been reached to produce any additional rent for the landlord, nor is any expected in the future.
We are mindful of General Statutes § 12-63b, which provides in part, "[i]n determining market rent the assessor shall consider the actual rental income applicable with respect to such property under the terms of an existing contract of lease at the time of such determination."
The market rent of comparable property, according to Flanagan, amounts to $12.50 per square foot. Kane, on the other hand, is of the opinion that $9.25 per square foot of gross building area represents market rent for the subject.
The flaw in Flanagan's determination of fair market value is that he uses market rent of $12.50 per square foot as his basis of potential gross income when using the discounted cash flow method. The discounted cash flow method selected by Flanagan projects an income stream over a five year period. The problem here is that a prospective purchaser, on October 1, 1994, cannot CT Page 11630 expect to receive the market rent as projected by Flanagan over a five year period, but rather the actual rent as provided in the subject lease. We find it more credible to use both the rental amount and the direct capitalization method of Kane, which results in a pro forma market net operating income of $91,947. While Kane uses an overall capitalization rate of 12 percent, we find that Flanagan's selection of 11 percent is more appropriate to the subject. Using the pro forma net operating income of $91,947 divided by the overall capitalization rate of 11 percent yields a fee simple value of the subject building of $835,881.
Both appraisers, in their determination of fair market value of the subject building, deducted a value for the land supporting the subject building. This is surprising since the value of the property being evaluated for tax purposes is the value of the property owned by Mall, Inc. encompassing the whole of the Village. What we are looking at is what percentage of the value of the cinema building contributes to the determination of the taxes paid by Mall, Inc. This is so because the provision in the plaintiffs' lease, which provides for the tenant to pay taxes, is only the average of the base tax. In other words, we are really placing a value on property owned by Mall Inc., not property owned by the plaintiffs. In this sense our main question is what is the value of the subject building owned by Mall, Inc. The issue becomes complicated because the plaintiffs' only interest in this case is the amount that they have to reimburse Mall Inc., a nonparty, for taxes over and above the base taxes in 1973.[3]
Crucial to this appeal is the fact that the plaintiffs are not contesting the value of the land as determined by the assessor on the list of October 1, 1994.[4] Given the fact that buildings in the Village, we have to determine, for the purpose of this appeal, what value the subject cinema building adds to the overall value of the Village. The land factor used by both Kane and Flanagan does not enter into the consideration of the value of the subject building. Since a willing buyer would be purchasing the whole Village and not just the cinema, we really should be looking at the fair market value of the whole Village and not just one building in the complex. Looking at the whole complex, the assessor placed a fair market value on the land of $100,000 per acre plus parking lot improvements for a total land value of $2,758,000. Flanagan arrives at the fair market value of the land apportioned to the subject building, using the formula in paragraph 28 of the subject lease as follows: CT Page 11631
Total land value $2,758,000
 Total building area divided by 112,059 square feet of gross building area
Rate per square foot $24.61
When we multiply $24.61 by the subject's 10,340 square feet, we arrive at the land valuation attributed to the subject building of $254,467. The land value of $254,467 is deducted from the total of $835,881 to arrive at $581,414, which we find to be the fair market value of the subject property on October 1, 1994. We recognize that the value arrived at is based upon market rent, not actual rental value. The landlord is restricted to actual rents until the lease expires in 2003. Fair market value is based on the market, not actual rent, although actual rent should be considered in establishing market rent. General Statutes § 12-63b. Both appraisers valued the subject property using market value rents. We have considered both market and actual rents in this case, and have based our determination on the path chosen by the appraisers for both parties. See First Bethel Associates v.Bethel, 231 Conn. 731, 651 A.2d 1279 (1995).
Judgment shall enter sustaining the plaintiffs' appeal without costs to either party. The assessor is ordered to reduce the assessment to 70% of the fair market value of $581,414 in accordance with this court's decision.
Arnold W. Aronson Judge Trial Referee