[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT (Nos. 107 108)
These cross motions for summary judgment present several procedural questions arising from a dispute over the proceeds of an insurance policy. For reasons explained below, while the plaintiff wins some important preliminary skirmishes, it is the defendant who must ultimately prevail.
On June 8, 1994, the parties, Utica First Insurance Co. ("Utica") and Jane McGuire ("McGuire"), entered into an insurance contract providing coverage for a building (the "building") owned by McGuire. In the event of damage to the building, the policy states that Utica will pay the value of certain losses. The policy also contains important provisions concerning "recoveries," discussed in detail below.
The building subsequently sustained damage from vibrations caused by a road construction project conducted by Martin Brothers, Inc. ("Martin"). McGuire demanded payment from Utica on the policy. McGuire and Utica agreed to have certain differences resolved by a panel of three arbitrators pursuant to a provision of the policy that allows the actual cash value of the property and the replacement cost of the property to be determined by appraisal. The arbitration agreement is facially limited to a determination of three values: (1) replacement cost; (2) replacement cost damages; and (3) sound value loss and damages. On May 22, 1996, the arbitrators returned a document that they entitled an "award." The "award" states that the replacement cost is $300,000; the replacement damage is $14,334.34; the sound value is $225,000; and the sound value loss and damage is $13,794.88.
On August 24, 1995, McGuire commenced an action against Martin in the Superior Court for the Judicial District of New Haven. McGuire v. Martin Brothers, Inc., No. 378015 (the "Martin
case"). The complaint in the Martin case seeks compensation for damages to the building caused by the same construction project that caused the damage at issue in the arbitration case. In June 1996, the Martin case was settled for the sum of $20,000. TheMartin case was withdrawn on June 28, 1996. On July 23, 1996, McGuire notified Utica of this fact. The notification states that McGuire "received a net of slightly over $17,000. This was a compromise of the total claim which was $33,947.75. Thus the arbitration award, less outstanding counsel fees, will almost — but not quite — make her home whole." CT Page 14580
On September 6, 1996, McGuire filed an application to confirm the arbitration award in the Superior Court for the Judicial District of New Haven. McGuire v. Utica First Insurance Co., No. 391413 (the "arbitration case"). The application was served on Utica on September 16, 1996. The arbitration case was heard by Hodgson, J. on October 7, 1996. Counsel for Utica prepared an appearance form dated October 7, 1996, although the form was not actually file stamped by the clerk until October 10, 1996. Hodgson, J. entered the order "Granted, absent objection" on the date of the hearing. The clerk formally notified counsel of the court's judgment on October 10, 1996. Utica has at no time moved to have the judgment in the arbitration case set aside.
On March 10, 1997, McGuire filed a property execution proceedings application in the arbitration case. The application states that the "amount of judgment" is $13,794.88. The application also claims a $10 application fee, for a total of $13,804.88. The application was not served on either Utica or its counsel pursuant to P.B. § 121 (now codified as P.B. § 10-12). Neither Utica or its counsel had either actual or constructive notice of the application. The execution was signed by the clerk on April 8, 1997. The clerk sent a copy of the application and execution to Utica at its home office in New York. Utica received these papers on April 11, 1997, and subsequently notified its attorney.
Utica did not file any motion in the arbitration case to have the execution set aside. Instead, it chose to commence the present action. This action was commenced by service of process on June 3, 1997, and filed in the Superior Court for the New Haven Judicial District. A temporary injunction was granted by DeMayo, J. on June 24, 1997. On April 23, 1998, Utica filed a motion for summary judgment (No. 107). On May 12, 1998, McGuire filed her own motion for summary judgment(No. 108). The motions were heard by the court in a consolidated proceeding on November 23, 1998.
A procedural dilemma in which the court finds itself must be addressed at the outset. "Collateral attacks on judgments are disfavored." Convalescent Center of Bloomfield, Inc. v.Department of Income Maintenance, 208 Conn. 187, 200,544 A.2d 604 (1988). It would have been infinitely preferble for Utica to have filed a timely motion to vacate the order of execution entered by the clerk in the arbitration case on April 8, 1997. Such a motion could surely have been filed within the same few CT Page 14581 weeks that it took Utica to commence the separate injunction case now before the court. Once filed, such a motion would have been promptly heard and, in all likelihood, promptly decided. The author of this opinion, for one, would almost certainly have vacated the clerk's order of execution from the bench once it became apparent that the order had been obtained by means of an ex parte application without notification of opposing counsel. A hearing on the substantive merits of the application could then have been scheduled with both counsel, and, in all probability, the entire case could have been resolved long before now. At argument, Utica was unable to explain why it has never filed such a motion.
Having said this, the court is unwilling to visit Utica with excessive punishment for the crime of killing a gnat with an elephant gun. The expense of commencing and litigating a separate action is an appropriate penalty that Utica has already visited on itself. To the extent that an equitable action is an appropriate, or at least recognizable, vehicle for seeking relief against a judicial order obtained by unfair surprise, the injunction case now before the court, should be decided on its merits. A requirement that Utica file yet another motion would merely add to the litany of procedural excess already burdening the court in this controversy.
Is an equitable action a recognized means of seeking relief in a situation like the one now before the court? An imposingly long line of jurisprudence answers this question in the affirmative. More than two hundred years ago, a Connecticut court, sitting in chancery, granted an injunction to prevent a party "from making use of a legal execution, for the purposes of vexation and injustice." Colt v. Cornwell, 2 Root 109, 111 (1794). The guiding principle stated in Colt's brief per curiam opinion was simply that, "Justice is done, the money is where it ought to be, and the petitioners ought to be quieted." Id. This precept seemingly left the trial court with almost unbridled discretion as to when to issue an injunction.
In 1836, Story, J. wrote a more rigorous — and, as will be seen, influential — description of when injunctions may be used to stay proceedings at law. "In general it may be stated, that in all cases, where by accident, mistake, fraud, or otherwise, a party has an unfair advantage in proceeding in a Court of Law, which must necessarily make that Court an instrument of injustice, and it is, therefore, against conscience, that he CT Page 14582 should use that advantage, a Court of Equity will interfere, and restrain him from using the advantage, which he has thus improperly gained." 2 Joseph Story, Commentaries on EquityJurisprudence 172-73 (1836). This formulation was swiftly adopted by our Supreme Court as "[t]he general principle on this subject, and which controls our opinion in regard to it." Tucker v.Baldwin, 13 Conn. 136, 144 (1839). Story's words were recited by the Court as authority well into this century. See Folwell v.Howell, 117 Conn. 565, 568-69, 169 A. 199 (1933).
The Court has attempted other formulations as well. An influential decision in the early years of this century states that, "fraud, collusion, accident, mistake, surprise and ignorance of the defense, when the negligence of the party is not one of the producing causes, are frequently recognized as creating situations justifying equitable interference, where it is also shown that a meritorious defense has been lost thereby, that the execution of the judgment would be against equity and good conscience, and that there is no other adequate remedy."Allis v. Hall, 76 Conn. 322, 330, 56 A. 637 (1904). A much more recent decision summarizes these principles as follows:
 Courts of equity may grant relief from the operation of a judgment when to enforce it is against conscience, and where the appellant had no opportunity to make defense, or was prevented from so doing by accident, or the fraud or improper management of the opposite party, and without fault on his [or her] own part . . . Fraud, accident, mistake, and surprise are recognized ground for equitable interference, when one, without his [or her] own negligence, has lost an opportunity to present a meritorious defense to an action, and the enforcement of the judgment so obtained against him [or her] would be against equity and good conscience, and there is no adequate remedy at law.
Cavallo v. Derby Savings Bank, 188 Conn. 281, 284-85,449 A.2d 986 (1482). (Internal quotation marks and citations omitted.)
The authority just cited suggests that an injunction may appropriately issue in the case now before the court if Utica is entitled to relief on the merits. Utica has squarely established a case of surprise. The execution order in the arbitration case was obtained, in violation of the Rules of Practice, without any notification of Utica or its counsel. This procedure plainly involved "improper management of the opposite party" and just as CT Page 14583 plainly did not involve any fault on Utica's part. Although McGuire attempts to fault Utica for not appealing the original judgment in the arbitration case, this asserted failure cannot be considered negligence or inattention on Utica's part under the peculiar circumstances now before the court. Utica, by its own admission, has no problem with the judgment in question. That judgment, as already discussed, merely fixes the value of curtain property losses that McGuire has incurred. The question of how much money she is ultimately entitled to under her insurance policy is a question that cannot be resolved solely by reference to the decision of the arbitrators as affirmed by the court. Other calculations must be made as well. It is for this reason that McGuire's act of obtaining an execution without notification of Utica was a particularly serious matter and that the enforcement of that execution — if, for purposes of argument, Utica is right on the merits — "would be against equity and good conscience."
McGuire's principal argument focuses on another procedural issue. She contends that injunctive relief is precluded because Utica has not applied for a writ of audita querela. "Audita querela is a common law writ that may be granted when a defense to a judgment arises for the first time after the judgment has been rendered." Oakland Heights Mobile Park, Inc. v. Simon,40 Conn. App. 30, 31 n. 1, 668 A.2d 737 (1995). See Ames v. Sears,Roebuck Co., 206 Conn. 16, 20, 536 A.2d 563 (1988). Audita querela would indeed be a plausible remedy available to Utica. The cause here — the issuance of an execution without notice to Utica — unquestionably arose for the first time after judgment was rendered. "The function of [the] writ at common law was to prevent the enforcement of a judgment when enforcement would be unjust because of matters arising subsequent to its rendition."Russell v. Klein, 317 N.E.2d 556, 558 (Ill. 1974). (Internal quotation marks and citations omitted.) It is apparent that, in this setting, the functions of audita querela and of injunction are substantially the same. Both forms of action are recognized procedural vehicles for obtaining relief from wrongfully obtained judgments and executions. The principal difference between the forms of action in question is historical. In early English practice, actions for audita querela were actions at law brought to King's Bench, and actions for injunction were equitable actions brought to the Chancellor. Stathum v. Denton (K.B. 1536),Reports of Sir John Spelman (J. H. Baker ed. 1977) in 93 Publications of the Selden Society 23. In Connecticut, of course, the distinction between legal and equitable actions was abolished CT Page 14584 long ago by the 1879 Practice Act. 1879 Conn. Pub. Acts ch. 83. "[L]egal and equitable rights of the parties may be enforced and protected in one action." Conn. Gen. Stat. § 52-1. Under these circumstances, it is not consistent with either Connecticut practice or the ends of justice to turn away a plaintiff for entering the wrong door of the writ house.
If anything, a long history of jurisprudence informs us that it is audita querela, and not injunction, that should be disfavored. The writ of audita querela has long since been abolished in the country of its birth; 37 Halsbury's Laws ofEngland ¶ 90 n. 1 (4th ed. 1982); and in federal practice on this side of the Atlantic; Fed.R.Civ.P. 60(b). Blackstone opined more than two centuries ago that the writ was "almost useless" and had, even in his day, been "driven . . . quite out of practice." 3 William Blackstone, Commentaries on the Laws ofEngland 405 (1768). It is something of a mystery why the writ continues to exist in Connecticut. The plain intention of the 1879 Practice Act was to abolish the old common law forms of action. Conn. Gen. Stat. § 52-91 provides that, "There shall be one form of civil action." The only exceptions to this rule are affirmatively created by statute. Conn. Gen. Stat. § 52-122, also derived from the Practice Act, provides that § 52-91 "shall not affect flowage petitions, or proceedings in paternity, replevin, summary process, habeas corpus, mandamus, ne exeat, quo warranto, forcible entry and detainer or peaceable entry and forcible detainer, or for the payment of awards." SeeHinckley v. Breen, 55 Conn. 119, 121-22, 9 A. 31 (1887). Audita querela is not among the enumerated forms of action thus saved from the sweep of § 52-1. In spite (and without discussion) of this significant statutory problem, our courts have continued to hold that audita querela remains a viable proceeding. But the fact that this ancient writ remains a viable option does not mean that it must be considered an exclusive remedy. "When these ghosts of the past stand in the path of justice clanking their medieval chains the proper course for the judge is to pass through them undeterred." United Australia, Ltd. v. BarclaysBank, Ltd., [1941] A.C. 1, 29 (H.L. 1940) (Atkin, L.J.). This court will consequently be undeterred by the fact that Utica has not proceeded in audita querela and turn to the merits.
The dispute between the parties on the merits focuses on the "recoveries" clause of the insurance policy in question. That clause provides in full as follows:
CT Page 14585
Recoveries — This applies if we pay for a loss and lost or damaged property is recovered, or payment is made by those responsible for the loss.
 a. The insured must inform us or we must inform the insured
if either recovers property or receives payment.
b. Proper costs incurred by either party are paid first.
 c. The insured may keep the property. The amount of the claim paid or a lesser amount to which we agree, must be returned to us.
 d. If the claim paid is less than the agreed loss due to a deductible, or other limiting terms, the recovery is prorated between the insured and us based on the interest of each in the loss.
The "subrogation" provision of the policy, immediately following, states that, "If we pay a loss to or for an insured
and the insured recovers from another party for the same loss, the insured must pay us as stated in Recoveries."
A provision of the policy dealing with "payment of loss or claim" is also important in the context of this case. The provision states that, "If you and we do not agree, we pay within 30 days after the filing of an appraisal award with us. Payment is made to you unless a loss payee is named."
These provisions, read together, firmly establish that Utica is prohibited by the terms of its own policy from taking the procedural course that it has taken in this case. An appraisal of McGuire's loss was made with the consent of both parties. The appraisal award was duly filed with Utica. Under the "payment of loss or claim" provision of the policy, Utica must pay McGuire within 30 days.
It is unquestionably true that Utica has certain rights against McGuire as a result of her settlement with Martin. "The principle that an insurer which has paid a claim for property destroyed through the fault of a third person may, in certain circumstances, be reimbursed out of the funds received by the insured in satisfaction of his claim against the third person, is generally recognized." Continental Insurance Co. v. ConnecticutNatural Gas Corp. , 5 Conn. App. 53, 59, 497 A.2d 54 (1985). CT Page 14586 Utica, however, has carefully set forth the procedural mechanism for such reimbursement in its own policy. The payment for the loss, as determined by the arbitrators, must first be paid to the insured under the "payment of loss or claim" provision. The insured must then repay Utica under the "recoveries" provision. While this sounds circular, it is not necessarily so. Under the "recoveries" provision, the amount to be returned to Utica is "[t]he amount of the claim paid or a lesser amount to which we
agree." The last clause of the provision just cited — i.e. "or a lesser amount to which we agree" — plainly contemplates a process of negotiation between Utica and its insured occurring after the initial payment of the proceeds, while those proceeds are in the hands of the insured. As in any other negotiation, it is obviously envisioned that compromise between the parties may be made. If no compromise is reached, Utica has the option of bringing an action against the insured for reimbursement of funds. Continental Insurance Co. v. Connecticut Natural GasCorp. , supra. Such an action, however, must be commenced after
the initial payment under the "payment of loss or claim" provision and after a process of negotiation that occurs while the insured holds the proceeds. If Utica ultimately prevails in such an action, its damages will not necessarily be fixed by the amount initially paid to the insured. "The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tortfeasor responsible for the damage, it can recover only the excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated for his loss." Thiringer v. AmericanMotors Insurance Co., 588 P.2d 191, 193 (Wash. 1978). The submissions of the parties in this case suggest that the amount (or even existence) of such an "excess" may be in considerable dispute in the event of future litigation. (It should be emphasized that this court is making no findings concerning the amount of damages in any future case. Sufficient unto the day is the evil thereof.)
The procedure just described is obviously a rather complicated mechanism for arriving at an ultimate resolution of the dispute between the parties. It is, however, the mechanism plainly required by Utica's own policy. "Where rights, duties and obligations are fully stated in a written contract between the parties . . . [i]t is not within the power of the court to make a new and different agreement." On Site Energy Corp. v. Sperry RandCorp. , 5 Conn. App. 326, 330, 498 A.2d 121, cert. denied,197 Conn. 818, 501 A.2d 388 (1985). To the extent that the policy CT Page 14587 here — an insurance contract — is ambiguous, it "must, by familiar principles, be construed against the insurance company that was its draftsman." Burritt Mutual Savings Bank v.Transamerica Insurance Co., 180 Conn. 71, 78, 428 A.2d 333
(1980).
This analysis makes it clear that Utica is prohibited by the terms of its own policy from obtaining the equitable relief it seeks in this action. For this reason, the plaintiff's motion for summary judgment must be denied, and the defendant's motion for summary judgment must be granted. Judgment shall enter for the defendant.
Jon C. Blue Judge of the Superior Court