Lillian G. SOLOMON, Appellant,

v.

Walter GREENBLATT, Individually, and Greenblatt & Associates, Inc., Appellees.

No. 05–90–00356–CV.

Court of Appeals of Texas, Dallas.

April 2, 1991.

Rehearing Denied Aug. 5, 1991.

Allen Landerman, Dallas, for appellant.

Michael D. Mosher, Dallas, for appellees.

Before McCLUNG [1], THOMAS, and OVARD, JJ.

## OPINION

OVARD, Justice.

This is a breach of contract case that requires interpretation of the Texas Insur-

1. The Honorable Pat McClung, Justice, participated in this cause at the time it was submitted to the panel for decision. Due to Justice McClung's retirement on January 31, 1991, he did not participate in the issuance of this opinion.

ance Code. The lawsuit arose from a dispute between Walter Greenblatt, an insurance agent/broker, and Dr. Lillian Solomon, a psychologist. Pursuant to two lifetime contracts, Solomon provided business consulting services to Greenblatt and to his corporation. Several years ago, Greenblatt stopped requesting consulting services and refused to pay Solomon. She sued on the two contracts. One contract obligated Greenblatt individually. The other agreement bound his corporation, Greenblatt and Associates, Inc. Greenblatt counterclaimed for fraud. The trial court granted Greenblatt a partial summary judgment that the contract between Solomon and himself individually violated the Texas Insurance Code and was therefore unenforceable. The parties proceeded on the remaining claims. After a bench trial, the trial court entered take-nothing judgments on all claims. Lillian Solomon perfected this appeal. We reverse the partial summary judgment and the take-nothing judgment against Solomon's remaining breach of contract claim. We remand this cause to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

Walter Greenblatt sells insurance. He is an agent for one insurance company and a broker for several others. Greenblatt has held a Texas insurance license since 1951. Dr. Lillian Solomon is a psychologist (now retired) who specialized in child psychology. Prior to studying psychology, Solomon worked for many years in a variety of businesses. She managed retail stores, served as an administrative assistant in the highway department, and did bookkeeping for an insurance agent or broker. She also managed a wholesale firm. Solomon began her psychology practice in 1962. In 1968, Dr. Solomon began treating Greenblatt's seven-year-old son for psychological underdevelopment. During the course of his son's therapy, Greenblatt mentioned to Solomon that despite his efforts he could not earn enough money to cover all his expenses. Solomon told Greenblatt that she had a business background, and she offered some business advice.

Greenblatt found Solomon's business advice helpful and hired her to provide business consulting services on a regular basis. At first he paid her $30 an hour and later paid her instead a monthly retainer. She advised him about personnel management, time management, and effective selling techniques. She did not meet with Greenblatt's clients and she never gave advice on insurance policies. She concentrated on streamlining management in Greenblatt's office and on improving his effectiveness as a salesman. Before major sales presentations, Solomon would discuss with Greenblatt ways to tailor a presentation strategy to a particular prospect. His business prospered.

In 1977, Greenblatt and Solomon entered into a consulting services contract, "the individual contract." (See Appendix A.) Under the individual contract, Solomon agreed "to provide Greenblatt with management consulting services in the insurance business, at such times and at such places as Greenblatt and Solomon shall mutually agree." Greenblatt obligated himself personally to pay Solomon a fixed yearly fee, plus a percentage of his "net insurance income" over a minimum level as compensation for Solomon's services. The contract expressly terminated all prior agreements between Solomon and Greenblatt. The agreement recited that it would last until the death of either party, and it included provisions for handling the disability of either Solomon or Greenblatt.

In 1978, Greenblatt formed a corporation to enable him to sell policies that he could not carry as an individual. Greenblatt channeled a portion of his business through the corporation. Solomon continued performance under the individual contract. Greenblatt wanted her to share in the prosperity of the corporation. He drafted a new contract, "the corporate contract," which named the corporation, Greenblatt and Associates, Inc., instead of Greenblatt individually as the buyer of the management consulting services. (See Appendix B.) The corporate contract supplemented but did not replace the individual contract. The agreement provided that Greenblatt and Associates, Inc. would pay Solomon

$1000 per month until her death or until the death or disability of Greenblatt. Solomon agreed under the corporate contract to give the company first call on up to ten hours per week of her time. Solomon also agreed to provide her own working facilities, including secretarial help, and to keep confidential some of the information she might learn while doing work for the corporation.

Solomon retired from her child psychology practice in 1985 and moved to New Jersey. She testified that she continued to perform under the two contracts after leaving Texas. On November 30, 1986, Greenblatt dissolved Greenblatt and Associates, Inc. for tax and business reasons. He continued to receive residual commissions for insurance policies sold through the corporation. Greenblatt and Associates, Inc. stopped paying Solomon sometime in the fall of 1986, after paying $9500 over the course of the year. Greenblatt last used Solomon's services in April 1987. He has not requested performance or paid her since that time.

Solomon filed suit to enforce payment under the two contracts. Greenblatt answered that the individual contract violated the Texas Insurance Code and was therefore unenforceable. He argued that the corporate contract was void for lack of consideration. Greenblatt counterclaimed for fraud and breach of fiduciary duty. The trial court awarded Greenblatt summary judgment on the individual contract. The trial court agreed with Greenblatt that the percentage of "net insurance income" portion of the individual contract constituted a commission-splitting agreement with a person who lacked an insurance license, and he accepted Greenblatt's argument that Texas law prohibits sharing commissions from the sale of insurance with unlicensed persons. *See generally* TEX.INS. CODE ANN. arts. 21.01, 21.07(1)(b) (Vernon 1981 and Supp.1991). The case proceeded to trial on the remaining causes of action. Solomon testified that she is still capable of performance and that she is available to perform if allowed. Greenblatt testified that once Solomon left Texas, she could no longer provide the face-to-face consultancy that he required.

At the conclusion of the trial, the trial court read his findings of fact and conclusions of law. He found that Greenblatt and Solomon had both signed the individual contract and the corporate contract. He found that Solomon had performed no services under either contract by "mutual consent" since October 1987. The trial court also found that Greenblatt and Associates, Inc. dissolved and that the corporation had not been Greenblatt's alter ego. Finally, the trial court found Lillian Solomon's life expectancy to be eleven years. The trial court concluded that: (1) Greenblatt was not liable under the individual contract because a) it was merely an agreement to agree and insufficiently definite to be enforceable, and b) Solomon was not entitled to share in the profits of an insurance business; (2) no consideration existed for the corporate contract because Solomon performed the same services under both contracts; (3) any liability Greenblatt might have under the corporate contract would be limited to $1500; (4) Greenblatt was not individually liable for the debts of the dissolved corporation since there was no alter ego relationship; and (5) the evidence was insufficient to support a finding on Greenblatt's net income either individually or through the corporation after its dissolution.

Solomon raises seven points of error on appeal. The first point attacks the partial summary judgment and subsequent trial court holding that the Texas Insurance Code renders the individual contract unenforceable. The first point also challenges the conclusion that the individual contract was merely an agreement to agree. The second point of error asserts that the trial court erred in determining that Solomon take nothing on her claim against the corporation. The third, fourth, and fifth points of error amplify the second. Solomon argues that the corporate contract was supported by consideration, that nothing limited the corporation's liability under the contract to $1500, and that Greenblatt was subject to personal liability for the corporation's debts after its dissolution.

The sixth point faults the trial court for not allowing her to amend her pleadings during the trial. She sought to increase her damages claim on the corporate contract from $2500 to $156,000. She argues that the trial court abused his discretion by denying leave to amend. The seventh point of error complains that the trial court improperly sustained three objections to evidence of damages owing on the individual contract in excess of the $16,932 originally pleaded. Solomon contends that the trial court admitted evidence of greater damages at several points during the trial, and that, therefore, the question of greater damages was tried by consent. Greenblatt challenges all of Solomon's points of error but raises no cross-points.

We will organize our analysis of Solomon's points of error thematically, but we will follow roughly the order she has laid out. We begin with the individual contract, proceed to the corporate contract, and finally address the issues related to the pleading of damages.

## LEGAL ANALYSIS OF INDIVIDUAL CONTRACT ILLEGALITY

■ The individual contract (see Appendix A) established a complicated scheme for compensating Solomon. Greenblatt agreed to pay a fixed annual sum, which escalated over time, plus an additional amount which depended on Greenblatt's earnings from his insurance business. The contract defined "gross insurance income" as gross insurance sales commissions and any other income Greenblatt earned "of any kind and of whatever nature" from insurance business. "Net insurance income," under the contract, meant "Gross Insurance Income less all ordinary and necessary business expenses paid or incurred in connection with the production of that Gross Insurance Income." Greenblatt contracted to pay Solomon 25% of net insurance income over $90,000 annually for five years and then 30% of net insurance income over $100,000 for every subsequent year.

Greenblatt argued on summary judgment that, despite the fact that he performed under the individual contract for

ten years, the contract is illegal and unenforceable. Greenblatt convinced the trial court, and he makes the same argument on appeal. He relies on a provision of the Texas Insurance Code:

> No insurer or licensed insurance agent doing business in this State shall pay directly or indirectly any commission, or other valuable consideration, to any person or corporation for services as an insurance agent within this State, unless such person or corporation shall hold a currently valid license to act as an insurance agent as required by the laws of this State....

TEX.INS.CODE ANN. art. 21.07, § 1(b) (Vernon 1981). Greenblatt buttresses his statutory argument by quoting provisions dealing with how to treat commission income owing to an agent who has died:

> On the death of a licensed agent, who is a sole proprietorship, unless otherwise provided by the will admitted to probate of that deceased agent, the surviving spouse and children, if any, of the deceased agent ... may share in the profits of the continuance of the agency business of the deceased agent, if the agency business is continued by a licensed agent.

TEX.INS.CODE ANN. art. 21.07, § 2A(b) (Vernon Supp.1991).

Greenblatt contends that, when read in conjunction, the two statutory provisions prohibit an insurance agent from paying any part of the profits of his insurance business to an unlicensed person, except his spouse and children. Greenblatt notes that the percentage-of-net-insurance-income portion of Solomon's compensation package constitutes sharing the profits of his insurance business. Greenblatt asserts that since Solomon is not his spouse or his child he cannot legally pay Solomon under the individual contract.

We believe Greenblatt overreads article 21.07, section 2A. We interpret article 21.07, section 2A, as merely a clarification of existing rights, rather than as the creation of a new exception to a rule that prohibited insurance agents from sharing commissions with their families. Article 21.07, section 2A, explains how profits may be

divided after an agent dies intestate. It does not purport to regulate with whom an agent may split commission income by gift, devise, or contract. For some years, Texas insurance agents have devised and contracted away posthumous commission income. *See generally Klein v. Klein,* 638 S.W.2d 94 (Tex.App.—Dallas 1982, writ ref'd n.r.e.).

Greenblatt also argues that the case of *Benefits Administration Corp. v. Rearick,* 705 S.W.2d 234 (Tex.App.—Texarkana 1986, no writ), governs his individual contract with Solomon. *Rearick* involved a business relationship in which a corporation without an insurance agent's license helped a licensed insurance agent obtain an agency agreement with an insurance company. The unlicensed corporation, "BAC," contracted to continue to support the agent "in writing of insurance business." The agent pledged to pay the corporation two percent (2%) of the gross commissions he reported to his principal, the insurance carrier. BAC sued the agent to enforce payment of its commission split. The agent raised illegality as a defense and moved for summary judgment. BAC filed no response to the motion for summary judgment. The trial court awarded the agent summary judgment. The Court of Appeals in Texarkana held that the contract violated the Texas Insurance Code articles 21.01 and 21.07, section 1(b). Article 21.01 provides:

It shall not be lawful for any person to act within this State, as agent or otherwise, in soliciting or receiving applications for insurance of any kind whatever, or in any manner to aid in the transaction of the business of any insurance company ... without first procuring a certificate of authority from the Board.

TEX.INS.CODE ANN. art. 21.01 § 1(b) (Vernon 1981). Article 21.07, section 1(b) (see text quoted above) prohibits the payment of insurance commissions or other valuable consideration for services as an insurance agent, unless the recipient holds an insurance license. Greenblatt urges that the *Rearick* holding is dispositive.

We believe *Rearick* is distinguishable. *Rearick* rested partially on article 21.01

(see above), a provision which Greenblatt does not argue in his brief. Article 21.01 proscribes "aid[ing] in the transaction of the business of an insurance company" without first getting a certificate of authority from the State Insurance Board. In *Rearick,* the agreement recited that BAC "aided and assisted [the agent] in obtaining an Agency Agreement with United Fidelity Life Insurance Company for marketing, underwriting and administration of certain Accidental Death and Dismemberment insurance programs...." *Rearick,* 705 S.W.2d at 235. The court evidently decided that helping to bring together the agent and United States Fidelity, an insurance company, aided in the transaction of the business of an insurance company. TEX. INS.CODE ANN. art. 21.01 (Vernon 1981). Article 21.01 is inapplicable to our case because Greenblatt's agency is not an insurance company within the meaning of the statute. The Texas Insurance Code defines several different varieties of insurance companies. They have in common "doing business under any charter involving the payment of any amount of money, or any other thing of value conditioned upon" the occurrence of some covered loss. TEX.INS. CODE ANN. art. 3.01, §§ 1–4 (Vernon 1981). Greenblatt does not contract with his clients to pay claims himself. According to his own testimony, he is an agent and a broker.

More importantly, the nature of the services that Solomon provided under the individual contract differs from the services which the unlicensed corporation apparently performed in *Rearick.* Article 21.07, section 1(b), prohibits paying an unlicensed person for services as an insurance *agent.* The Texas Insurance Code defines who is an agent:

Any person who solicits insurance on behalf of any insurance company ... or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or in-

spect any risk, or receive, or collect, or transmit any premium of insurance, or make or forward any diagram of any building or buildings, or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself, or who shall examine into, or adjust, or aid in adjusting, any loss for or on behalf of any such insurance company, whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of, or by, any broker or other person, shall be held to be the agent of the company for which the act is done, or the risk is taken....

TEX.INS.CODE ANN. art. 21.02 (Vernon Supp. 1991). Greenblatt testified conclusorily that Solomon acted as an insurance agent, but the evidence does not show that she performed any of the acts enumerated in article 21.02. The trial testimony established that Solomon coached Greenblatt in sales techniques and presentation strategies. Greenblatt admitted, when pressed, that Solomon had no contact with any of his clients and never solicited prospects. She helped him draft business letters to make them more effective, but she never reviewed risks or selected policies. Basically, Solomon helped Greenblatt to sell himself more effectively. She did not sell insurance. By selling himself more effectively, Greenblatt apparently sold more insurance. In *Rearick*, the contract recited that the unlicensed corporation would "continue to support [the agent] in the writing of insurance business." *Rearick*, 705 S.W.2d at 235. Support in the writing of insurance business is conduct different in kind from coaching sales techniques.

We cannot know exactly what services the unlicensed corporation performed in *Rearick*. The corporation neglected to file a response to the agent's motion for summary judgment. As a result the trial court and the appellate court had to take as true the summary judgment evidence the agent presented. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979). No factual dispute developed. Perhaps for that reason, no description of the services actually provided appears in the opinion. Our lack of knowledge of the underlying facts in *Rearick* limits its precedential value.

The peculiar nature of the individual contract makes this a case of first impression. Texas has an extensive jurisprudence holding that unlicensed persons and corporations may not receive commission splits or any other monetary compensation for performing services which require an insurance license. *See Rearick*, 705 S.W.2d at 235–36; *Armstrong v. Tidelands Life Ins. Cos.*, 466 S.W.2d 407, 409 (Tex.Civ.App.— Corpus Christi 1971, no writ) (*citing Tidelands Life Ins. Co. v. Armstrong*, 414 S.W.2d 196, 197 (Tex.Civ.App.—Austin 1967, no writ), and *Perkins v. Lambert*, 325 S.W.2d 436, 438–39 (Tex.Civ.App.— Austin 1959, writ dism'd)). However, we have found no Texas case in which a licensed insurance agent has entered into a profit-splitting arrangement to pay for non-insurance services. A few cases have arisen in other jurisdictions.

In a Maryland case, a licensed insurance agency signed a real estate lease that based part of the rent on its insurance income. The insurance agency agreed to pay: "a sum equal to two and one-half (2½%) percent of the gross premiums on all insurance policies written, by or through the insurance policies written by or through the insurance business conducted at the demised premises." *See Wright v. Trotta*, 34 Md.App. 309, 367 A.2d 557, 560 (1976). The insurance agency breached the lease and asserted that the percentage rental clause violated the Maryland equivalent of Texas Insurance Code article 21.07:

*Commissions, fees, etc. not to be paid to unlicensed persons.*—No commission, fee reward, rebate or other consideration for procuring or influencing the procurement of any insurance shall be paid, directly or indirectly to any person who is not then licensed pursuant to the provisions of this subtitle....

MD.ANN.CODE art. 48A, § 167 (1972). The appellate court recognized that the more insurance the lessees sold, the more money the landlord would make. Nonetheless,

that fact did not render the contract illegal. *Wright*, 367 A.2d at 561. The court noted that nothing in the lease agreement required the landlord be paid anything "for procuring or influencing the procurement of insurance." *Id.* The court held that consideration for the percentage rent was the use and occupancy of the leasehold, not any activity that required the landlord to hold an insurance license. *Id.* The lease was not therefore illegal. *Wright*, 367 A.2d at 562.

A Connecticut case followed the same logic. *See Rizzo v. Price*, 162 Conn. 504, 294 A.2d 541 (1972). Nicholas Rizzo, the plaintiff, and Claude Price, Jr. were partners in an insurance agency partnership. Theodore Thomas, another defendant, was an employee of the partnership. Thomas procured a valuable account which provided more than 50% of the partnership's income. The partners later dissolved the partnership. They agreed to split three ways the continuing income stream from the large account. Rizzo left the insurance industry. Four years after the dissolution, Price and Thomas stopped forwarding payments to Rizzo. They argued that, since he no longer had the type of insurance license necessary under State law to handle the types of policies the large account used, they could not legally split commission income with him. The Connecticut Supreme Court concluded that, since the dissolution agreement did not require Rizzo to perform the services for which an insurance license was required and Rizzo did not perform any insurance services, the agreement was enforceable. *Rizzo*, 294 A.2d at 544–45. A common thread runs through *Wright* and *Rizzo*. The state insurance licensing laws exist to "[protect] the public from surrendering its money in exchange for questionable or worthless pieces of paper denominated insurance policies." *Rizzo*, 294 A.2d at 544 (*citing State ex rel. Herbert v. Standard Oil Co.* 138 Ohio St. 376, 381, 35 N.E.2d 437, 440 (Ohio 1941)). The statutes do not seek to prevent insurance agents from paying for services out of their commission income. The laws prohibit paying an unlicensed person for services as an insurance agent. *Rizzo*, 294 A.2d at 544; *Wright*, 367 A.2d at 561–62.

We believe that the Texas statute accomplishes the same purpose as the insurance licensing laws interpreted in *Wright* and *Rizzo*. "The intent of the Legislature in providing that insurance agents must be licensed was obviously for the protection of the public in respect to the purchase and sale of insurance policies." *Great National Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex.1964). When construed according to its ordinary terms, Texas Insurance Code article 21.07, section 1(b) does not prohibit in all circumstances the payment of money from insurance commissions to unlicensed persons or corporations. The statute prohibits paying unlicensed persons or entitles for *services as an insurance agent.* Article 21.02 specifies in detail the services of an insurance agent. Consistent with article 21.07, section 1(b), an insurance agent may pay income from commissions to unlicensed persons as compensation for services not listed in article 21.02. The critical question for determining the legality under the Texas Insurance Code of a commission splitting arrangement is the nature of the services performed by the unlicensed person or corporation. Article 21.07, section 1(b) exists to forestall the unlicensed practice of insurance by prohibiting the payment of unlicensed persons for insurance services. The Legislature did not intend to restrict the manner in which licensed insurance agents may pay for non-insurance services. In our case, the evidence adduced at trial does not support a conclusion that Solomon performed the services specified in article 21.02. We see no basis for declaring the individual contract illegal under article 21.07, section 1(b). Greenblatt could legally pay Solomon for services that fall outside the ambit of article 21.02. He could pay her a fixed fee, a monthly retainer, or a percentage of his insurance income. We conclude that the individual contract was legal.

## INDEFINITENESS OR AGREEMENT TO AGREE

■ The trial court concluded that the individual contract was too indefinite to be

enforceable. The judge relied upon language in the second numbered paragraph, entitled "Consulting Services:"

Solomon shall provide Greenblatt with management consulting services in the insurance business, *at such times and at such places as Greenblatt and Solomon shall mutually agree.*

(Emphasis added.) The trial court termed the contract "an agreement to agree." Solomon disputes his conclusion. We agree with Solomon.

■ When a contract is unambiguous, the court construes the contract as a matter of law. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Praeger v. Wilson*, 721 S.W.2d 597, 600 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). Neither Solomon nor Greenblatt pleaded ambiguity, and we find none. As a general rule, an agreement simply to enter into negotiations for a contract later does not create an enforceable contract. But parties may agree on some of the terms of a contract, and understand them to be an agreement, and yet leave other portions of an agreement to be made later. *Scott v. Ingle Bros. Pacific, Inc.*, 489 S.W.2d 554, 555 (Tex.1972); *City of Fort Worth v. Gene Hill Equip. Co.*, 761 S.W.2d 816, 820 (Tex.App.—Fort Worth 1988, no writ).

■ The individual contract contains terms specific enough to merit enforcement. The contract recites agreement on the nature of the services to be provided (management consulting), the term of the contract (the life of either party), and the price to be paid (a fixed yearly sum plus a percentage of Greenblatt's profits). The only major point on which the parties did not agree explicitly was the time and place of performance. Yet for nine years they performed the contract. The lack of prior agreement presented no barrier. Many service contracts leave the exact time and place of performance open for future agreement. When a contract leaves open the time and place of performance, the law will imply that the time of performance was to be a reasonable time. *Moore v. Dilworth*, 142 Tex. 538, 542, 179 S.W.2d 940, 942 (1944). What is reasonable depends on the facts and circumstances as they existed at the date of the contract. *Heritage Resources, Inc. v. Anschutz Corp.*, 689 S.W.2d 952, 955 (Tex.App.—El Paso 1985, writ ref'd n.r.e.). Texas law implies that Solomon and Greenblatt contracted for her to perform her services when and where reasonable, given the nature of her services and the nature of their business relationship. We conclude that the individual contract is definite enough to permit enforcement. We sustain Solomon's first point of error.

## LEGAL ANALYSIS OF THE CORPORATE CONTRACT

### Lack of Consideration

■ The trial court concluded that no consideration supported the corporate contract because Solomon performed the same services under both agreements. We agree that Solomon rendered approximately the same services under each contract, but we detect consideration for both agreements.

A valuable and sufficient consideration for a contract may consist of either a benefit to the promisor or a loss or detriment to the promisee. In other words, sufficient consideration for the agreement may consist of some right, interest, profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party. Accordingly, it is not necessary that the promisor receive a benefit under the agreement. On the contrary, if the promisee parts with some legal right or sustains some legal injury as the inducement for the agreement, this will be sufficient.

*Champlin Petroleum Co. v. Pruitt*, 539 S.W.2d 356, 361 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.) (*citing Lassiter v. Boxwell Bros., Inc.* 362 S.W.2d 884 (Tex. Civ.App.—Amarillo 1962, no writ)).

In the corporate contract, Solomon agreed to accept additional obligations she did not assume in the individual contract.

She agreed that Greenblatt and Associates, Inc. could "have first call upon [her] services not to exceed ten (10) hours per week." She did not pledge in the individual contract to make herself available on such a regular basis. Solomon consented in the corporate contract to "furnish her own office, secretarial help and other facilities and services necessary for the adequate performance of her consultative duties." She did not promise to provide those services for herself in the individual contract. Finally, Solomon agreed not to disclose the corporation's confidential information which she might learn in the course of her service. The individual contract mentioned nothing about confidential information. The additional obligations in the corporate contract, not contained in the individual contract, create valid consideration. We hold that, as a matter of law, the corporate contract was supported by consideration.

## CORPORATE LIABILITY AFTER DISSOLUTION

■ The trial court ruled that, even if consideration existed for the corporate contract, the liability of Greenblatt and Associates, Inc. could not exceed $1500. The trial court did not explain the reasons for his ruling, but the record reveals the evidence and the argument on which he relied. The corporation contracted to pay Solomon $1000 per month. In 1986, the corporation paid Solomon $9500 through October, the tenth month of the year. The corporation dissolved on November 30, 1986. At the time of dissolution, Greenblatt and Associates, Inc. owed Solomon $1500, assuming the contract was enforceable. Greenblatt argued that corporations can incur no further liabilities after dissolution. Therefore, the corporation could owe no more than $1500. On appeal, Solomon argues that dissolution does not necessarily stop the meter running on a corporation's pre-dissolution liabilities, and that Greenblatt and Associates, Inc. owes more than $1500.

We agree with Solomon. The Texas Business Corporation Act governs the dissolution of a Texas corporation. The statute establishes that claims against the dissolved corporation survive dissolution for three years, unless otherwise barred by limitations:

A. A corporation dissolved (1) by the issuance of a certificate of dissolution or other action by the Secretary of State, [or] (2) by a decree of a court when the court has not liquidated all the assets and business of a corporation as provided in this Act ... shall continue its corporate existence for a period of three (3) years from the date of dissolution, for the following purposes:

(1) prosecuting or defending in its corporate name any action or proceeding by or against the corporation,

(2) permitting the survival of any remedy not otherwise barred by limitations available to or against the corporation, its offices, directors, shareholders, or creditors, *for any right or claim existing, or any liability incurred before the dissolution....*

(emphasis added). TEX.BUS.CORP.ACT ANN. art. 7.12(A)(1, 2) (Vernon Supp.1991). On its face, the statute means merely that Solomon retains a post-dissolution cause of action against the corporation for whatever right or claim she had upon dissolution. Greenblatt admits that point in his reply brief. We must determine the nature of her pre-dissolution "right or claim." The critical question is whether a (partially) executory contract to render a service to a corporation is enforceable after the corporation has dissolved. If the contract becomes unenforceable at the point of dissolution, the corporation's liability is capped at $1500.

Neither Solomon nor Greenblatt cited a Texas case on point, and our research has revealed none. The Texas cases in this area have concerned types of claims different from the one Solomon asserts. *See Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547 (Tex.1981) (personal injury caused by defective elevator); *Reveille Tool & Supply, Inc. v. State*, 756 S.W.2d 102 (Tex.App.—Austin 1988, no writ) (suit by State of Texas for overdue sales taxes after corporation had dissolved); and *River Oaks Shopping Center v. Pagan*, 712 S.W.2d 190 (Tex.App.—Houston [14th

Dist.] 1986, writ ref'd n.r.e.) (breach of shopping center lease by corporation which forfeited its corporate charter for failure to pay taxes). To resolve this question, we explore cases involving analogous situations in Texas and in other jurisdictions.

Traditionally, American courts analogized corporate dissolution to the death of a natural person. *Oklahoma Natural Gas Co. v. Oklahoma,* 273 U.S. 257, 259, 47 S.Ct. 391, 392, 71 L.Ed. 634 (1927); *Corsicana Transit Co. v. Walton,* 189 S.W. 307, 309 (Tex.Civ.App.—Texarkana 1916), *aff'd* 222 S.W. 979 (Tex.Comm'n App.1920, judgm't adopted). In Texas, the death of a natural person does not ordinarily extinguish his contracts. *Henry v. Powers,* 447 S.W.2d 738, 744 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ). However, the death of a natural person does terminate a contract for personal services. *Salter v. Jones,* 348 S.W.2d 381, 383 (Tex.Civ.App.—El Paso 1961, no writ). A contract requires personal services when the parties contemplate that the person agreeing to render the services must perform them personally. *Tenneco Oil Co. v. Padre Drilling Co.,* 453 S.W.2d 814, 819 (Tex.1970). The contract between Solomon and Greenblatt contemplates that Solomon will perform her business consulting services personally. Under the dissolution-equals-death formulation, the contract would end upon the dissolution of Greenblatt and Associates, Inc. Solomon's damages would stop at the value of services rendered before corporate "death"—$1500.

However, the death analogy is inadequate to this situation. Corporations are not natural persons, and generally speaking they do not die as a result of accident or natural processes. Instead, their directors or shareholders decide to kill them. In recognition of that fact, a number of courts have held that a corporation cannot rid itself of unwanted executory contracts, even for personal services, by committing a timely ritual suicide. "A corporation dissolved by its voluntary act remains bound by its outstanding executory contracts." *Dorn v. Stanhope Steel, Inc.,* 368 Pa.Super. 557, 534 A.2d 798, 802 (1987), citing 19 Am.Jur.2d *Corporations* § 2888. *See also*

*Martin v. Star Publishing Co.,* 50 Del. 181, 126 A.2d 238, 242 (1956); *State ex rel. Everett Trust & Savings Bank v. Pacific Waxed Paper Co.,* 22 Wash.2d 844, 157 P.2d 707, 713 (1945). Courts view with disfavor the notion that a corporation may set aside its liabilities by dissolving and distributing its assets to the shareholders. *See Wyoming–Indiana Oil & Gas Co. v. Weston,* 43 Wyo. 526, 7 P.2d 206, 209–10 (1932).

The applicability of the rule does not depend upon the motivations behind a voluntary dissolution. The *Star Publishing* case is factually analogous to our case. Joseph Martin, Sr. owned all the stock of Star Publishing Company, which published a newspaper. Martin sold all the stock to J. Edwin Carter in 1946 for $105,000, payable over about ten years. Part of the sales contract provided:

> Carter will cause The Star Publishing Company, upon final settlement, to retain Martin as an advisor in the conduct of its printing and publishing business, such employment to be for the lifetime of said Joseph H. Martin, Sr. Martin hereby agrees to act in such capacity and hold himself available at reasonable times to perform his said duties. The consideration for such contracted employment shall be $40,000.00 payable at the rate of $100.00 a week for the first 400 weeks from and after October 7, 1946, until the full amount of the $40,000.00 shall have been paid to Martin, his heirs, administrators, executors or nominees; and further that if Martin shall be living and able and willing to perform his duties here under, Martin shall continue to receive the sum of $100.00 a week for a period of 120 weeks.

*Star Publishing,* 126 A.2d at 240. A separate provision made clear that Martin enjoyed an irrevocable option to work the 120 weeks after expiration of the 400–week primary term. The court noted that the employment contract served principally as a means of paying Martin for the sale. *Id.* The Star discontinued its business on April 18, 1954, and refused to make any further payments. Martin invoked his employment

option for the 120 weeks, which The Star refused to honor.

The trial court held that "voluntary cessation of The Star's business did not excuse Star from its contractual obligation to make the payments." *Star Publishing,* 126 A.2d at 241. However, the trial court held for The Star that it did not have to employ Martin. The trial court determined that the continued existence of The Star was an implied condition of its liability to Martin on the option period of the employment contract. *Id.* at 242. Martin appealed, and the Delaware Supreme Court reversed.

The court noted that impossibility of performance is not available as a defense to the party which by its voluntary act created the impossibility. *Star Publishing,* 126 A.2d at 242–43. The court noted that a judicially enforced dissolution may in some cases relieve a corporation of liability on a personal services contract. However, if the corporation dissolves itself or closes down its business, even a personal services contract "though made impossible of performance, is made so by the act of the corporation, and it or its assets are liable for its failure to fulfill its obligations." *Star Publishing,* 126 A.2d at 243, citing 6 S. WILLISTON: A TREATISE ON THE LAW OF CONTRACTS § 1960. The court continued: "Star voluntarily chose to discontinue its business, presumably for financial reasons. Impossibility originating in financial incapacity is no excuse.... There is ample authority that a contract to pay for services to be rendered over a specified time is not discharged by the voluntary cessation of the business of the employer." *Star Publishing,* 126 A.2d at 243. We are persuaded by the reasoning in *Star Publishing.*

In a more recent case, the Virginia Supreme Court followed the same logic. *See Thrasher v. Thrasher,* 217 Va. 672, 232 S.E.2d 734 (1977). The court construed a contract in which the stockholders of a corporation agreed to establish a retirement plan and to pay the widows of two deceased stockholders $100 per month pending the establishment of the retire-

ment plan. The corporation dissolved without procuring a retirement plan and refused to continue paying the widows. The corporation argued that it was not liable. Like the Star, it relied upon the principle of impossibility of performance: "Contracts of a corporation made prior to its dissolution survive unless the circumstances are such that the contract must contemplate termination on such dissolution." *Thrasher,* 232 S.E.2d at 737. The corporation contended that the contract must have contemplated termination when the corporation ceased to exist. The Virginia Supreme Court recognized in dicta the possibility of such a defense, but held that the agreement with the widows did not contemplate the dissolution of the corporation, but instead its indefinite continuation. *Id.* As we understand it, the *Thrasher* "exception" encompasses the rare circumstance where a corporation exists, and is understood to exist, solely for the purpose of performing a function that the contracting parties know to be of finite duration, and the anticipated terminal event occurs.

We hold that, subject to the possible exception suggested in *Thrasher,* the voluntary dissolution of a Texas corporation does not relieve it of liability for its executory contracts, including executory contracts to pay for personal services. The *Thrasher* "exception" does not apply to our case. Nothing in the corporate contract indicates that the parties expected the corporation to dissolve as long as Greenblatt was still working. Greenblatt formed his corporation to help him sell insurance. Nothing has rendered him incapable of selling insurance. At the time of trial, Greenblatt was still selling insurance. He testified that he dissolved his corporation "basically because of the excessive cost of running a corporation, the state franchise tax, bond, accounting fees, additional records to be kept by [his] office manager, federal employment taxes, on and on and on." In other words, he dissolved Greenblatt and Associates, Inc. because it had become unprofitable. We believe the general rule governs. The voluntary dissolution of Greenblatt's corporation did not extinguish its liability for its executory contracts, in-

cluding its contract with Solomon. The trial court erred in ruling that the corporation's liability to Solomon could not exceed $1500. We sustain points of error two, four, and five.

## LEGAL ANALYSIS OF GREENBLATT'S PERSONAL LIABILITY FOR THE CORPORATION'S DEBTS

By the time of trial, Greenblatt had already liquidated his corporation and had distributed the net assets to himself. Solomon could get no recovery from the assets of the corporation. She alleged two theories, which, if proved, would make Greenblatt personally liable for at least part of the corporation's debt. She argued (1) that the corporation served merely as Greenblatt's alter ego; and (2) that Greenblatt awarded himself a shareholder distribution from a dissolved corporation and was therefore liable, to the extent of assets received upon dissolution, for the corporation's remaining debts. *See* TEX.BUS.CORP. ACT art. 6.04(A)(3) (Vernon 1980 and Supp. 1991). The trial court found that no alter ego relationship existed. The trial court made no ruling on Greenblatt's shareholder liability under the Texas Business Corporation Act, presumably because the trial court held that no consideration supported the corporate contract.

## ALTER EGO

■ "The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations but when these individuals abuse the corporate privilege, courts will disregard the corporate fiction and hold them individually liable." *Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1986). "Alter ego" is one of the theories that allows Texas courts to disregard the corporate form. "Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Castleberry,* 721 S.W.2d at 272. There is no rigid legal standard. "Texas takes a flexible, fact-specific approach focusing on equity." *Id.* at 273.

We agree with the trial court that our facts do not justify a finding of alter ego. The record reveals that in 1985 Greenblatt paid Solomon for both the individual and the corporate obligations out of the corporate account. One incident of paying personal expenses out of corporate funds does not show a pattern of ignoring the separateness of the corporation. Without such a pattern, we cannot say that a unity exists between the business affairs of the individual and those of the corporation. In addition, no injustice results from a failure to find alter ego. Solomon was familiar with the workings of Greenblatt's business, and she accepted a promise secured only by the general credit of the corporation.

## SHAREHOLDER DISTRIBUTEE LIABILITY

■ The Texas Business Corporation Act establishes a procedure for winding up the affairs of a corporation before filing articles of dissolution. Article 6.04(A)(3) directs that the corporation shall marshal its assets and pay its liabilities and obligations, or make adequate provision for paying them, before distributing the remaining assets to the shareholders. The Texas Supreme Court has fashioned an equitable remedy, the trust fund doctrine, for curing situations in which shareholders receive distributions while creditors go unpaid. *Henry I. Siegel Co. v. Holliday,* 663 S.W.2d 824, 827 (Tex.1984); *Hunter,* 620 S.W.2d at 550. Under the trust fund doctrine, "when the assets of a dissolved corporation are distributed to the shareholders, a creditor of the dissolved corporation may pursue the assets on the theory that in equity they are burdened with a lien in his favor." *Henry I. Siegel,* 663 S.W.2d at 827. If the assets can no longer be traced, the directors of the dissolved corporation become personally liable for their value. *Id.* at 828.

Greenblatt has received substantial distributions from the dissolved corporation. He was the director who determined that he would receive the distribution. He will

be liable for Solomon's judgment against the corporation to the extent of distributions received. We cannot now determine the amount of corporate liability, but our holding that consideration supported the corporate contract establishes a $1500 floor. We have also concluded that the act of dissolution did not set a $1500 ceiling. We sustain Solomon's third point of error with respect to Greenblatt's potential individual liability under the Texas Business Corporation Act. We overrule the part of point of error three which claims alter ego liability.

## LEGAL ANALYSIS OF POINTS OF ERROR SIX AND SEVEN

We address these two points in reverse order. In point of error seven, Solomon complains that the trial court improperly sustained objections to evidence of the amount due her under the individual contract. The trial court excluded such evidence in accordance with his ruling on the motion for partial summary judgment. By sustaining point of error one, we open the door to evidence of Greenblatt's "net insurance income." Accordingly, we sustain Solomon's seventh point of error.

The sixth point of error argues that the trial court should have granted Solomon leave to amend her pleadings with respect to the corporate contract. She filed a pretrial motion for leave to increase damages sought from $2500 to $156,000. The trial court denied her motion.[2] Toward the end of the trial, the court allowed her a trial amendment to seek $170,000 on the corporate contract. That ruling cured any error caused by the original denial. We overrule point of error six.

## CONCLUSION—INDIVIDUAL CONTRACT

We conclude that the Texas Insurance Code does not regulate the manner in which insurance agents may pay unlicensed persons for services not covered by the insurance agent licensing statute. Article 21.02 of the Texas Insurance Code specifies the services for which a person without an insurance license may not be paid. We hold that the Texas Insurance Code does not bar enforcement of the "percentages" or "commission-splitting" provisions of the individual contract. (See Appendix A.)

We conclude that the individual contract is sufficiently definite to allow enforcement. It is not merely an agreement to agree. However, the fact that the contract is specific enough to permit enforcement does not prove Greenblatt's liability. The trial court must determine whether Solomon could render satisfactory performance after she left Texas. In addition, the trial court must hear evidence on Greenblatt's "net insurance income."

## CORPORATE CONTRACT

We hold that the corporate contract is supported by valid consideration. (*See* Appendix B.) We also hold that the dissolution of the corporation does not cap the corporation's liability at $1500. We believe that Greenblatt is personally liable for the dissolved corporation's debts to the extent that Greenblatt received distributions of corporate assets after dissolution. The trial court made no finding on the value of assets distributed to Greenblatt. On remand, the trial court must hear evidence on the value of the distributions. As with the individual contract, the amount of liability will depend upon whether Solomon was available and able to render satisfactory performance under the contract once she left Texas.

## DISPOSITION

We reverse the judgment of the trial court and remand the case for determination of:

1. Whether Solomon remained available and able to render the kinds of ser-

---

**2.** The trial began on November 22, 1989. Solomon filed her motion for leave to amend on November 3, 1989. Parties normally can amend without leave of court up to seven days before the trial setting. However, Solomon had received a continuance on October 20, 1989. The trial court conditioned the granting of the continuance on Solomon not amending her pleadings without his approval.

vice envisaged by each of the contracts once she left Texas;

2. Greenblatt's net insurance income, as defined by the individual contract;

3. The value of distributions from the assets of Greenblatt and Associates, Inc. that Walter Greenblatt received after the corporation dissolved;

4. Any additional facts, relevant in the light of our opinion, necessary to render proper judgment.

We further direct the trial court to grant both parties leave to replead as necessary to conform their pleadings to our judgment. It is so ordered.

THOMAS, J., concurs.

## EXHIBIT A

## CONSULTING SERVICES AGREEMENT

AGREEMENT made as of April 1, 1977 between WALTER GREENBLATT, C.L.U. of 3626 North Hall, Dallas, Texas 75219 ("Greenblatt") and LILLIAN G. SOLOMON, Ph.D. of 3707 Rawlins, Dallas, Texas 75219 ("Solomon").

WHEREAS, Greenblatt and Solomon entered into an agreement dated as of April 1, 1976 which provided for certain consulting services to be rendered by Solomon to Greenblatt and for certain compensation to be paid by Greenblatt to Solomon; and

WHEREAS, Greenblatt and Solomon revised that agreement with their amendment dated January 25, 1977; and

WHEREAS, Greenblatt and Solomon desire to further revise that agreement.

NOW, THEREFORE, it is agreed as follows:

1. *Termination of Prior Agreement.* The agreement dated April 1, 1976 between Greenblatt and Solomon as revised by the amendment dated January 25, 1977 is hereby terminated effective March 31, 1977.

2. *Consulting Services.* Solomon shall provide Greenblatt with management consulting services in the insurance business, at such times and at such places as Greenblatt and Solomon shall mutually agree.

3. *Term.* The term of this agreement shall commence on the date hereof and shall conclude upon the death of either Solomon or Greenblatt.

4. *Definitions.*

(a) The term "Gross Insurance Income" as used herein means gross insurance sales commissions and other insurance business income of any kind and whatever nature earned by Greenblatt or with respect to which earnings Greenblatt has made a substantial contribution, whether payable to Greenblatt or to any firm, company or corporation in which Greenblatt has a business interest or otherwise.

(b) The term "Net Insurance Income" as used herein means Gross Insurance Income less all ordinary and necessary business expenses paid or incurred in connection with the production of that Gross Insurance Income.

(c) The term "Contract Year" as used herein means a period commencing on a January 1 and ending on the following December 31.

5. *Compensation.*

(a) As compensation (i) for such consulting services and (ii) for certain consulting services rendered to Greenblatt by Solomon prior to the date hereof, Greenblatt shall pay to Solomon a portion of his Net Insurance Income in each Contract Year during the term of this agreement, as follows:

For each Contract Year during the period January 1, 1976 to December 31, 1977, Greenblatt shall pay to Solomon Eight Thousand Dollars ($8,000) plus Twenty-five Percent (25%) of any Net Insurance Income in excess of Ninety Thousand Dollars ($90,000) which Greenblatt may have in such Contract Year.

For each Contract Year during the period January 1, 1978 to December 31, 1980, Greenblatt shall pay to Solomon Nine Thousand Dollars ($9,000) plus Twenty-five Percent (25%) of any Net Insurance Income in excess of Ninety Thousand Dollars ($90,000) which Greenblatt may have in such Contract Year.

For the January 1, 1981 to December 31, 1981 Contract Year, Greenblatt shall

pay to Solomon Ten Thousand Dollars ($10,000) plus Thirty Percent (30%) of any Net Insurance Income in excess of One Hundred Thousand Dollars ($100,-000) which Greenblatt may have in that Contract Year.

For the January 1, 1982 to December 31, 1982 Contract Year, Greenblatt shall pay to Solomon Eleven Thousand Dollars ($11,000) plus Thirty Percent (30%) of any Net Insurance Income in excess of One Hundred Thousand Dollars ($100,-000) which Greenblatt may have in that Contract Year.

For the January 1, 1983 to December 31, 1983 Contract Year, Greenblatt shall pay to Solomon Twelve Thousand Dollars ($12,000) plus Thirty Percent (30%) of any Net Insurance Income in excess of One Hundred Thousand Dollars ($100,-000) which Greenblatt may have in that Contract Year.

For each Contract Year thereafter, Greenblatt shall compensate Solomon in accordance with the payment specifications set forth in the previous paragraph for the January 1, 1983 to December 31, 1983 Contract Year, provided, however, that the fixed dollar payment amount shall be adjusted upward or downward by the percent of change in the Consumer Price Index prepared and published by the Bureau of Labor Statistics of the United States Department of Labor (the "Consumer Price Index") for the January in such Contract Year as compared with the Consumer Price Index for the prior January. For example, if the Consumer Price Index were 10% higher in January, 1984 than in January, 1983, then, for the Contract Year January 1, 1984 to December 31, 1984, Greenblatt would be obligated to pay to Solomon Thirteen Thousand Two Hundred Dollars ($13,200) plus Thirty Percent (30%) of any Net Insurance Income in excess of One Hundred Thousand Dollars ($100,000) which Greenblatt may have in that Contract Year.

(b) Notwithstanding anything to the contrary in this agreement, if for any reason Solomon is unavailable for such consulting services for more than a total of six months during any Contract Year in the period January 1, 1976 to December 31, 1978, then Greenblatt shall pay to Solomon for that Contract Year one-half of the amount that he otherwise would have been required to pay to her pursuant to Paragraph 5(a) hereof.

(c) Notwithstanding anything to the contrary in this agreement, if as a result of any injury or illness, Greenblatt is unable to perform his normal and regular functions and duties in the insurance business as defined by and so as to be able to collect disability income insurance from the Paul Revere Insurance Company for a continuous and uninterrupted period of three months or more during any Contract Year during the term of this agreement, then Greenblatt shall pay to Solomon for that Contract Year one-half of the amount that he otherwise would have been required to pay to her pursuant to Paragraph 5(a) hereof; provided, however, that no such payments shall be made for any such Contract Year in which Greenblatt is so disabled, in any of the following events:

(i) Such Contract Year occurs in the period January 1, 1976 to December 31, 1978 and Greenblatt's Net Insurance Income in such Contract Year is less than Sixty Thousand Dollars ($60,000).

(ii) Such Contract Year occurs in the period January 1, 1979 to December 31, 1981 and Greenblatt's Net Insurance Income in such Contract Year is less than Sixty–Five Thousand Dollars ($65,000).

(iii) Such Contract Year occurs in the period January 1, 1982 to December 31, 1984 and Greenblatt's Net Insurance Income in such Contract Year is less than Seventy Thousand Dollars ($70,000).

(iv) Such Contract Year is a Contract Year subsequent to the January 1, 1984 to December 31, 1984 Contract Year and Greenblatt's Net Insurance Income in such Contract Year

is less than Seventy–Five Thousand Dollars ($75,000).

(d) Notwithstanding anything to the contrary in this agreement, if as a result of any injury or illness, Greenblatt is unable to perform his normal and regular functions and duties in the insurance business as defined by and so as to be able to collect disability income insurance from the Paul Revere Insurance Company continuously and without interruption for any full Contract Year during the term of this Agreement, then Greenblatt shall not be required to make any payments to Solomon under Paragraph 5(a) hereof for such Contract Year.

(e) On or before May 1 of each year Greenblatt shall provide Solomon with a detailed and accurate written account of his Gross Insurance Income and his Net Insurance Income during the previous Contract Year, together with the payment of the amount shown to be due to Solomon therein.

6. *Expenses.* Greenblatt shall pay all expenses incurred by Solomon in connection with the providing of consulting services pursuant to the terms of this agreement. He shall promptly reimburse Solomon for all such expenses advanced by her.

7. *Insurance.* Greenblatt and Solomon shall each have the right to take out insurance on the life of the other, naming himself or herself as beneficiary. Each shall pay all premiums due on the insurance policy or policies taken out by him or her.

8. *Complete Agreement and Amendments.* This agreement constitutes the complete understanding of Greenblatt and Solomon and shall not be amended except for an instrument signed by both Greenblatt and Solomon.

IN WITNESS WHEREOF, Greenblatt and Solomon have executed this agreement as of the date hereinabove written.

/s/ Walter Greenblatt
Walter Greenblatt
/s/ Lillian G. Solomon
Lillian G. Solomon

EXHIBIT B

## AGREEMENT

THIS AGREEMENT, made by and between GREENBLATT & ASSOCIATES, INC., a corporation (hereinafter called the "Company"), and LILLIAN SOLOMON, Ph.D., (hereinafter called the "Consultant");

## WITNESSETH:

WHEREAS, the Company is very desirous of retaining Consultant as an independent consultant to the management of the Company with respect to the Company's business and affairs for the remainder of Consultant's lifetime; and

WHEREAS, Consultant has agreed to enter into a consulting agreement with the Company upon the terms herein set forth;

NOW, THEREFORE, for and in consideration of the fee to be paid Consultant hereunder and the mutual promises, covenants and undertakings herein contained, the Consultant and the Company hereby agree as follows:

(1) *Term:* The term of this Agreement shall be for the period commencing on the date of this Agreement and continuing during the remainder of Consultant's lifetime.

(2) *Consultation Fees:* The Company shall pay the Consultant as compensation for her services hereunder a fee of One Thousand Dollars ($1,000.00) per month, payable in advance on the first day of each month, beginning May 1, 1984, and continuing for the remainder of Consultant's lifetime.

(3) *Consultation Services:* During the period of this Agreement, Consultant will, in the capacity of an independent contractor, act as an advisor and consultant to the management of the Company; and in such capacity Consultant will furnish the Company as reasonably requested from time to time, her best advice, information, judgment and knowledge with respect to business methods, practices, history, customers, employees and suppliers of the Company and its subsidiaries, if any, and will generally advise and consult with the management of the Company regarding matters affecting its business and affairs.

(4) *Extent of Services:* The Consultant and the Company agree that during the term of this Agreement the Company shall have first call upon the Consultant's services not to exceed ten (10) hours per week. It is agreed that the Consultant shall not be available: (1) during reasonable vacation periods each year, (2) any periods of illness or other incapacity, or (3) during reasonable times allocated to personal affairs.

(5) *Working Facilities:* The Consultant shall furnish her own office, secretarial help and other facilities and services necessary for the adequate performance of her consultative duties.

(6) *Agreement Not to Disclose Information:* The Consultant recognizes and acknowledges that she will have access to confidential information of the Company from time to time while she performs consultive services, which information is a valuable, special and unique asset of the Company's business. Therefore, as a part of this Agreement, the Consultant agrees that she will not, during or after the term of this Consultative Agreement disclose such confidential information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever.

(7) *Independent Contractor:* Consultant shall employ her own means and methods of accomplishing the projects assigned to her by the management of the Company from time to time and shall not be subjected to the control of the Company in respect to the details of such work. The Company shall be concerned only with the results of such work and not with the means by which it is accomplished. It is understood and agreed that Consultant shall act as an independent contractor in the undertaking of this Agreement. It is expressly understood and stipulated that no employer-employee relationship exists between the Company and the Consultant.

(8) *Expenses:* The Consultant is authorized to incur reasonable expenses (including, without limitation, traveling expenses) in the performance of her services as a Consultant to the management of the Com-

pany. The Company shall reimburse the Consultant for all such valid expenses upon presentation by the Consultant, from time to time, of an itemized account of such expenditures.

(9) *Contract Funded Only By General Credit of Company:* It is specifically recognized by the parties hereto that the Company shall not be required to set aside any specific assets, or otherwise create any type of fund, to meet its obligations under this Agreement, even though payment of Consultant's fees shall not commence until May 1, 1984. The rights of Consultant hereunder and of any person claiming under the Consultant shall be solely those of an unsecured creditor of the Company.

(10) *Disability:* If Consultant is unable to perform by reason of illness, injury or incapacity during the term of this Agreement, the monthly payments required by paragraph (2) above shall nevertheless continue until Consultant's death. If Walter Greenblatt is unable to perform the duties of his normal course of employment with the Company due to illness, injury, or incapacity, for a period of time which is expected to be permanent or of long duration, then the monthly payments required by paragraph (2) above shall cease as of the last day of the month in which such illness, injury, or incapacity occurs, and this Agreement shall terminate as of such date.

(11) *Death:* This Agreement shall terminate immediately upon the death of Consultant, and no further payments shall be due Consultant or her estate after her death, except for the monthly fee for the month in which Consultant dies.

(12) *Assignment:* The rights and obligations of the Company under this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company. The Consultant shall not assign any rights accruing to her hereunder.

(13) *Death and Disability:* This agreement shall be terminated by the death or disability of Walter Greenblatt; disability being defined in accordance with the definition of disability provided by his disability policy with the State Mutual Life Assurance Company. Disability shall also be

defined in line with Walter Greenblatt's regular occupation clause with State Mutual Life Assurance Company. In the event of the death of Walter Greenblatt, this agreement will terminate the month following that event.

(14) *Governing Law:* The parties hereto agree that this Agreement shall be governed by, subject to, and interpreted according to the laws of the State of Texas.

IN WITNESS WHEREOF, the parties have executed this Agreement on this 1 day of February, 1984.

> GREENBLATT & ASSOCIATES, INC.
>
> By: /s/ Walter Greenblatt
> President
> COMPANY

ATTEST:

/s/ Maxine F. Goldman

> Secretary
> /s/ Lillian Solomon
> Lillian Solomon, Ph.D.
> CONSULTANT

THOMAS, Justice, concurring.

I concur in the decision to reverse the judgment and remand the cause to the trial court.